COLONIAL MORTGAGE COMPANY OF INDIANA, INC.
*v.* GEORGE J. WINDMILLER

[No. 3-376A64. Filed June 5, 1978.]

*Stephen L. Williams, Roger W. Hultquist, Snouffer, Haller & Colvin,* of Fort Wayne for Appellant.

*George P. Roberts* of South Bend, for appellee.

GARRARD, P.J. — Windmiller recovered judgment against Colonial for bonus compensation due under an employment contract, and Colonial appeals.

Colonial hired Windmiller in February 1968 as a commercial loan sales representative. He worked with commercial borrowers in putting

together "loan packages" which were designed to apprise potential lenders of the economic feasibility of a project. When completed, the loan package was presented to long term lenders to induce them to supply the necessary risk capital for the venture. Upon a successful placement Colonial received fees from both the borrower and the lender for its services and for servicing the loan thereafter.

On January 1, 1969 after some eleven months in Colonial's employ, Windmiller entered into a written contract of employment with Colonial. The contract provided for a monthly salary, a "bonus" based upon the fees earned by Colonial on loans Windmiller originated, a monthly advance against the earned bonus and reimbursement of business expenses in return for Windmiller's services. These terms were subsequently modified to increase the bonus percentage and base salary and decrease the monthly advance against bonus. The contract provided that subject to certain conditions the bonus would be payable "at the time a loan is closed and disbursed, or earlier, at the option of the company...." "Closed and disbursed" referred to that time when the long term mortgage was executed and delivered in return for the loan proceeds.

Colonial ordinarily paid its sales representatives, including Windmiller, their bonuses before the loan was "closed and disbursed." However, there were exceptions when it appeared that the loan might not in fact close, or if payments to Colonial prior to closing were not made in cash.

In November 1974, Windmiller's employment with Colonial was terminated. At the time of his termination, Windmiller had completed the services to be performed by him for two construction projects known as Castlepoint and Concord Square.[1] Although there was some question about the possibility of modification and Colonial's fees had been paid in part by promissory notes, commitments from lenders had been received for the projects. These loans were not "closed and disbursed" prior to Windmiller's separation. Colonial refused to pay Windmiller a bonus upon them.

---

1. The projects were actually separated into phases, and only certain phases are here involved. The distinctions, however, are not germane to the issues on appeal and are, therefore, ignored.

## The Employment Contract

It is Colonial's position that under the provisions of Windmiller's employment contract, he was not entitled to bonus on these projects because they were not "closed and disbursed" before his termination. They rely upon the following provision contained in the written contract:

"*If you remain in the employ of the company through December 31, 1969 and have neither served nor been served by the company with notice of termination of employment hereinafter described,* you will receive in addition to the compensation heretofore described, a bonus, based on commercial loans originated by you, as follows:

*At the time a loan is closed and disbursed, or earlier, at the option of the company, you will receive credit for gross fees applicable to the loan,* including origination fees from the borrower as well as fees paid by an investor, but less any brokerage fees paid or owing. Your annual bonus will be based on 10% of the net income generated, i.e. gross fees less expenses."

(emphasis supplied)

Contrary to Colonial's assertion, it must be recognized that Windmiller's bonus arrangement was contractually enforceable. The amount and terms for the bonus were sufficiently specific and clearly █ provision for bonus payments was in contemplation of services *yet to be performed* by Windmiller. *See Spickelmier Industries, Inc. v. Passander* (1977), 172 Ind. App. 49, 359 N.E.2d 563.

The question remaining is whether the opening clause of the provision requires a forfeiture to bonus rights because Windmiller was terminated before the loans were closed and disbursed, although he had performed the services he was supposed to perform and the loans were eventually completed.

In interpreting a written contract our purpose is to determine the intent of the parties at the time the contract was made as disclosed by the language they employed to define their rights and duties. ██ *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Equip. Corp.* (1974), 160 Ind. App. 26, 309 N.E.2d 464. However, if the terms of the contract are ambiguous, rules of contract construction or extrinsic circumstances may be resorted to in giving effect to the parties'

reasonable expectations. *House v. Lesow* (1975), 167 Ind. App. 449, 339 N.E.2d 86. The test for determining the existence of such an ambiguity is whether reasonably intelligent persons could come to different conclusions as to its meaning. *Tastee Freeze Leasing Corp. v. Milwid* (1977), 173 Ind. App. 675, 365 N.E.2d 1388. The central issue in the present case is whether there is ambiguity concerning the necessity of Windmiller's continued employment as a condition precedent to Colonial's obligation of payment. If so, well settled rules of construction require us to conclude that Windmiller's termination of employment does not affect his right to commissions otherwise payable under the contract.

Our reading of the language in question suggests that it is reasonably susceptible of two different interpretations. The first is that asserted by Colonial, i.e., that in addition to remaining in Colonial's employ through December 31, 1969, Windmiller was required to be employed with the company when the bonus became payable. The second is that the clause beginning ". . . and have neither served nor been served . . ." merely requires that for bonus compensation to be due, notice of termination by either the company or Windmiller not be given as of December 31, 1969. The ambiguity arises because it is unclear whether the "and" joins two separate and independent conditions or whether it simply further modifies the requirement that Windmiller remain in Colonial's employ through December 31, 1969.[2] Contributing to this ambiguity is the fact that the language relied upon by Colonial refers not to continued employment per se but only to serving "notice of termination." *Compare Montgomery Ward & Co. v. Guignet* (1942), 112 Ind. App. 661, 45 N.E.2d 337. In short, the requirement that Windmiller must con-

---

2. Colonial argues that a finding of ambiguity can be reached only by construing the "and" connecting the two conditions precedent as a disjunctive. We disagree. Giving full effect to the "and" as a conjunctive there is still a patent ambiguity as to the idea the joined phrases were to express. It is reasonable to conclude that so long as Windmiller was in Colonial's employ and had not given or received notice of termination as of December 31, 1969 he had met the conditions required by the contract. The latter condition is not meaningless. The contract contained a 30 day notice of termination requirement. Thus Windmiller could have been in Colonial's employ as of December 31, 1969 yet have given notice of termination nearly a month earlier. Furthermore, since the bonus was a substantial aspect of Windmiller's earnings, it is reasonable to assume the parties would intend different consequences for a termination during the first year of the contract from a termination occurring in later years.

tinue to be employed with Colonial at the time a loan is "closed and disbursed" to be entitled to his commission is not clear and explicit.

As Windmiller points out, ambiguous terms in a contract will normally be construed against the party who employed the language. *City of South Bend v. Blue Lines* (1942), 219 Ind. 462, 38 N.E. 2d 573; *McMahan Constr. Co. v. Wegehoft Bros., Inc.* (1976), 170 Ind. App. 558, 354 N.E.2d 278; *Mandle v. Owens* (1975), 164 Ind. App. 607, 330 N.E.2d 362. In the present case this would indicate that we should adopt the reasonable interpretation favoring Windmiller.

That indication is buttressed by the disfavor with which the law views forfeiture provisions. Such provisions will be enforced where the contract clearly requires, but if there is doubt we favor the construction avoiding a forfeiture. *Western & Southern Life Ins. Co. v. Vale* (1938), 213 Ind. 601, 611, 12 N.E.2d 350, 354; *Franklin Life Ins. Co. v. Wallace, Admr.* (1883), 93 Ind. 7, 11; *Standard Life Ins. Co. v. Grigsby* (1923), 80 Ind. App. 231, 235, 140 N.E. 457, 458. Colonial's interpetation of the contract would amount to a forfeiture because it would deny Miller the bargained-for compensation from Colonial, although it received the bargained-for benefits. Thus, under Colonial's interpretation it could, at any time, have deprived Windmiller of commissions for his services by giving him termination notice before a loan (or loans) was closed and disbursed. While the parties might agree to such provisions, they must employ unequivocal language to that effect if they intend to seek enforcement in the courts. *See Montgomery Ward v. Guignet* (1942), 112 Ind. App. 661, 45 N.E.2d 337.

The court did not err in its construction of the contract.

Finally, Colonial contends that in construing the contract, the court went outside the issues that were framed by the pre-trial order. We disagree.

The pre-trial order disclosed that it was Windmiller's contention that the contract had been modified as to when the bonus became payable. However, it was also his contention that he had earned the commissions on the Castlepoint and Concord Square projects. Similarly, Colonial contended that the contract had not been modified, and that Windmiller

was not entitled to commissions because of the contract language dealing with employment through 1969 and notice of termination. Thus, the issues presented the question of Windmiller's entitlement to the bonuses, and it was necessary for the court to apply the provisions of his employment contract to answer the question. To do so it had to ascertain the meaning of the contract. It therefore did not go outside the issues in doing so.

### Colonial's Set Off

At the trial Colonial attempted to inquire about other bonus compensation paid to Windmiller during 1974. When Windmiller's objection was sustained, Colonial offered to prove that if permitted to answer, its witness would have testified that Windmiller was overpaid other commissions. The exclusion of this evidence is assigned as error.

The proffered testimony did not concern payment of commissions on either Castlepoint or Concord Square. Instead its effect, if credited, would be to establish that even though Colonial was liable for commissions on Castlepoint and Concord Square, Windmiller was not entitled to judgment for the full amount of those commissions because he was to some extent indebted to Colonial. Thus, the proffered evidence was not relevant to establish liability for the commission sued for. It was, instead, a matter of counterclaim.

A review of the transcript discloses, however, that Colonial did not file or attempt to file a counter-claim pursuant to Indiana Rules of Procedure, Trial Rule 13. It did not assert such a claim at the pre-trial conference or in the pre-trial order. *See* TR. 16(J); *Spickelmier Industries, Inc. v. Passander, supra.* Nor did it seek to invoke the trial court's discretion to permit late amendment by moving to amend to allow assertion of the counter-claim during the trial itself, as permitted by *Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335. TR. 16(J) provides that the pre-trial order shall control the subsequent course of action, unless it is thereafter modified by the court to prevent manifest injustice.

Two distinct but related purposes attend this provision of the rule. The policy of the rules is to promote justice and expedite proceedings. To secure better justice, notice pleading supplants the old code forms

and emphasis is upon the facts. However, the blade of justice has two edges. One permits a claimant to advance his claim unburdened by a vast array of dilatory motions. The other recognizes that at some point in the litigation process those defending a claim are entitled to know what it is they are to defend against. In the interests of justice litigants are granted considerable latitude during the formative stages of the litigation so that the issues may be drawn and refined with the benefit of the broad discovery afforded by the rules. *See, e.g., State v. Rankin* (1973), 260 Ind. 228, 294 N.E.2d 604. The process permits the discovery and sifting of relevant information to the purpose that the genuinely disputed questions of fact and law may be clearly presented for resolution. Its advantage lies in permitting the truth seeking process to proceed relatively unhampered by dilatory and technical requirements so that the "truly litigable" questions may be identified and submitted to trial. Yet claims and defenses are made in accord with law. Both the elements necessary to a recovery and the special defenses that may be available to defeat it depend on the legal theory upon which the claim is advanced. Thus, to the extent that notice pleading does not result in crystalization of the legal theories of claim and defense there remain indistinct areas in the litigation; areas which substantially affect, if not control, the witnesses and evidence which must be produdced at trial.

The mechanism provided by our rules for accommodating both goals is the pre-trial conference and pre-trial order. At that point discovery should be completed and the theories of the case settled upon. In order that the pre-trial order may constitute an accurate blueprint for the trial and the parties may know what evidence they are called upon to produce, TR. 16(J) contains the limitation previously referred to. Certainly the court is invested with discretion to permit modifications of the pre-trial order. It may also, in its discretion, deny such amendments, and in either event, appellate review is limited to ascertaining whether the court committed an abuse of discretion.[3]

---

3. TR. 15(B) regarding amendments to conform to the evidence is not at odds with the foregoing. The purpose of TR. 15(B) is to permit amendment where issues not contained in the pre-trial order are in fact litigated by express or implied consent. While it also provides for amendment although an objection has been made that proffered evidence is outside the issues, the court has discretion to grant such amendments; and should not do so where the objecting party establishes that amendment would prejudice him in maintaining his action or defense.

TR. 13 provides that counter-claims, whether intended to result in a money judgment for the counter-claimant or merely to reduce the amount of plaintiff's recovery, are to be filed as a part of the responsive pleading. Colonial filed no such counter-claim.

TR. 13(F) does provide that when a pleader fails to set up a counter-claim "through oversight, inadvertence or excusable neglect, or when justice requires" he may *by leave of court* amend to add the counter-claim. Colonial sought no such leave prior to entry of the pre-trial order. Even when it attempted to introduce the evidence at trial, it did not expressly ask that the issues be amended. *Compare, Ayr-Way Stores, Inc., supra.*

On appeal Colonial also argues that its counter-claim should have been deemed an issue since the pre-trial order stated that one of the matters in dispute was the amount of bonus compensation to which Windmiller was entitled. It similarly argues that the issue was raised because the original complaint alleged $10,000 was due and Colonial denied that allegation. This latter assertion would, of course, render TR. 13 nugatory. The phrasing of the issue in the pre-trial order certainly is not an express assertion of a counter-claim, and we need not decide upon what basis the court might have permitted amendment. The issue before us is answered if the court is not shown to have abused its discretion in denying the amendment.

In the present case it does not appear that the basis for a counter-claim was ever suggested until the evidence was offered at trial. Clearly the proffered evidence went into matters not theretofore in dispute, and in the absence of some showing to the contrary, we must presume that Windmiller was not then prepared to meet it. Moreover, this occurred despite the clear admonition of TR. 13 that such matters be promptly raised in the pleadings. It does not appear that the court abused its discretion or committed error in excluding the evidence.

Affirmed.

Staton, J. and Lowdermilk, J. (sitting by designation) Concur.

NOTE—Reported at 376 N.E.2d 529.