Michael E. HIGHHOUSE, M.D.,
Appellant–Plaintiff,

v.

MIDWEST ORTHOPEDIC
INSTITUTE, P.C., Ap-
pellee–Defendant.

No. 89A01–0202–CV–75.

Court of Appeals of Indiana.

Feb. 4, 2003.

Jeffrey R. Gaither, T. Joseph Wendt, Leagre Chandler & Millard LLP, Indianapolis, IN, Attorneys for Appellant.

Norris Cunningham, Hall Render Killian Heath & Lyman, P.S.C., Indianapolis, IN, Attorney for Appellee.

**1.** At the time of the Agreement, MOI was known as Orthopaedic Consultants, P.C. It subsequently changed its name to Midwest Orthopedic Institute, P.C.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Michael E. Highhouse, M.D. (Highhouse), appeals the trial court's judgment in favor of Appellee–Defendant, Midwest Orthopedic Institute, P.C. (MOI)[1], and against him on the parties' cross-motions for partial summary judgment.

We reverse and remand.

### ISSUES[2]

Highhouse raises three issues for review, two of which we find dispositive and restate as follows:

1. Whether the trial court erred in holding that the parties' Employment Agreement (Agreement) did not entitle Highhouse to bonus payments subsequent to his voluntary resignation from MOI.

2. Whether MOI's failure to pay Highhouse any bonus after his voluntary resignation from MOI violated Ind.Code § 22–2–5–1.

### FACTS AND PROCEDURAL HISTORY

MOI is an Indiana medical professional corporation with its principal place of business in Richmond, Indiana. On May 16, 1996, Highhouse and MOI entered into an Agreement for Highhouse's services as a physician. The Agreement covered an initial period of two years, beginning July 1, 1996, subject to automatic renewal each year thereafter. Among other things, the Agreement provided:

3. *Compensation.*

**2.** MOI's Motion to Strike certain portions of Highhouse's Reply Brief is hereby denied.

(a) *Salary.* Commencing August 1, 1996, for all services rendered by Employee under this Agreement, Employer shall pay Employee an annual base salary of Two Hundred Fifty Thousand Dollars ($250,-000.00) which amount shall.be payable monthly on the last day of each month in the amount of Twenty Thousand Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ($20,833.33).

(b) *Bonus.* Employer shall also pay an annual bonus to Employee based upon Employee's productivity, collection of accounts, office expenses for the offices located in Richmond, Indiana and Connersville, Indiana, and the net income of the offices located in Richmond, Indiana and Connersville, Indiana during each Applicable Year, which for purposes of this Agreement shall be a calendar year from January 1 until December 31. The Applicable Year for 1996 will be a short year commencing July 1, 1996 and the Employee's bonus shall be reduced pro rata.

For purposes of this Agreement, net income shall be defined as the gross receipts (collections) of Employer within such Applicable Year which are attributable to professional services rendered by all physicians of Employer at all locations, reduced by the ordinary and necessary business expenses which are attributable to the operation of all business locations of Employer. Bonuses shall be paid no later than February 28 following the end of the previous calendar year.

(c) *Retirement plan.* A 401(k) plan as established by Employer with eligibility commencing July 1, 1997.

(d) *Health Insurance....*

(e) *Life insurance....*

(Appellant's Appendix pp. 16–18). Although the Agreement stated that the annual bonus was to be paid "no later than February 28 following the end of the previous calendar year" (Appellant's App. p. 17), the parties agree that MOI made "quarterly advanced payments" each March, June, September and December. (Appellant's App. p. 75).

On March 2, 1999, Highhouse notified MOI that he was resigning his employment effective June 30, 1999. MOI paid Highhouse his quarterly advanced bonus payments through May 1999, in accordance with the method proscribed in the Agreement. Highhouse received his final salary payment in July. Highhouse, however, did not receive any further bonus payments after his resignation, even though MOI continued to receive payments on accounts receivable Highhouse generated prior to his departure.

On December 13, 1999, Highhouse filed his Complaint for Damages. Count III of the complaint alleged that after June 30, 1999, MOI continued to receive collections from the professional services Highhouse rendered while employed by MOI, and that MOI breached the Agreement by not making subsequent bonus payments to Highhouse based on those receipts. Count VI alleged that Highhouse's "bonus constitutes a 'wage' pursuant to Ind.Code §§ 22–2–4 *et. seq.*" and that "MOI's failure to pay [him] his full bonus for the month of June and its failure to pay him any bonus after June 30, 1999, despite its receipt of payments for professional services [he] rendered while employed with MOI, constitute violations of Ind.Code § 22–2–5–1" (Indiana's Wage Payment Statute). (Appellant's App. p. 13).

On April 18, 2001, Highhouse moved for partial summary judgment on his "claim

that the parties' contract obligates [MOI] to pay him compensation for services [he] rendered prior to his employment separation from [MOI] and that his contractual 'bonus' constitutes a 'wage' under Ind. Code § 22–2–5 *et seq.* . . ." (Appellant's App. p. 30). In support of that motion, Highhouse designated his affidavit, wherein he stated: "MOI never communicated any policy, via contract or otherwise, that I had to be in MOI's employ at the end of each quarter, or the end of the year, in order to receive bonus payments." (Appellant's App. p. 44).

In response, MOI cross-filed for partial summary judgment on the same issue. In its cross-motion, MOI argued that Highhouse's resignation of employment invoked Paragraph 9 of the Agreement, which read:

> 9. *Termination without Cause.* Employer may terminate this Agreement at any time and without cause effective upon ninety (90) days advance written notice provided to Employee. In such event, Employee shall continue to render his services, and shall be paid his regular compensation up to the date of termination.

(Appellant's App. p. 21). MOI argued that this provision evidenced the Agreement's clear intent that Highhouse was not entitled to any bonus payments after his date of resignation. Further, MOI argued, even if Paragraph No. 9 did not apply, "there is no specific language authorizing bonus payments after resignation, nor was there any intention by the parties to include such a provision in the Agreement." (Appellant's App. p. 50). To support these assertions, MOI designated affidavits from its Chief Executive Officer and from its accountant.

Highhouse responded with a supplemental affidavit stating that it had been his understanding and intention that "Para-

graph 9 of this Agreement only applied if MOI terminated my employment without cause, not if I left voluntarily," and that he "did not believe paragraph No. 9 meant I would not receive bonus payment after a voluntary separation for services I performed while an MOI employee." (Appellant's App. pp. 98–99).

On August 10, 2001, MOI moved for leave to file its Answer and Affirmative Defenses. The trial court heard oral argument on the cross-motions for partial summary judgment on August 31, 2001, at the start of which the trial court granted "the motion for filing with the exception of its being used for purposes of today's hearing." (Tr. p. 3). On November 13, 2001, the trial court entered its summary Order Granting Defendant's Cross–Motion for Partial Summary Judgment with Regard to Count III and a Portion of Count VI (Order), which states:

> The Court, having considered the Complaint, Answer, designated evidence, briefs and argument of counsel; now finds that Defendant's Cross–Motion for Partial Summary Judgment should be granted with respect to Count III and that portion of Count VI which addresses the allegations of Count III. The Plaintiff's Motion for Partial Summary Judgment should be denied.

(Appellant's App. p. 7). Highhouse now appeals. Additional facts will be provided as needed.

### DISCUSSION AND DECISION

#### I. *Standard of Review*

When reviewing an entry of summary judgment, this court applies the same standard as the trial court. *Burkett v. American Family Ins. Group,* 737 N.E.2d 447, 451 (Ind.Ct.App.2000). Summary judgment may only be granted when the evidence designated to the trial court demon-

strates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.* at 451–52; Ind. Trial Rule 56(C). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." *Mendenhall v. City of Indianapolis,* 717 N.E.2d 1218, 1224 (Ind.Ct. App.1999). Once the moving party successfully demonstrates the absence of any dispute regarding the material facts and their inferences, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. *Burkett,* 737 N.E.2d at 451. We review such pure questions of law de novo. *Id.* The fact that the parties filed cross-motions for summary judgment does not alter our standard of review; we must consider each motion separately to determine whether the undisputed facts entitle either party to judgment as a matter of law. *Lake States Ins. Co. v. Tech Tools, Inc.,* 743 N.E.2d 314, 318 (Ind.Ct.App. 2001). If our review of the record discloses an incorrect application of the law to the undisputed facts, then we must reverse the grant of summary judgment. *Id.* at 317.

■■■ An unambiguous contract, *i.e.* one that does not require extrinsic evidence for interpretation, makes an appropriate subject for summary judgment. *Sample v. Kinser Ins. Agency, Inc.* 700 N.E.2d 802, 804 (Ind.Ct.App.1998). "When summary judgment is granted based upon the construction of a contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that the ambiguity can be resolved without the aid of factual determinations." *Id.* Thus, a contract rendered ambiguous solely by its own language presents a question of law for the court. *Robinson v. Century Personnel, Inc.,* 678 N.E.2d 1268, 1270 (Ind.Ct.App. 1997). In ascertaining the contract's clarity or lack thereof, we consider the whole document, not just the disputed language. *Id.*

## II. *Post-resignation bonus payments*

■■ Highhouse moved for summary judgment on his claim that his voluntary resignation from MOI did not relieve MOI of its contractual obligation to pay him a bonus based on the accounts receivable he generated while employed, but not paid to MOI until after his resignation. Highhouse argues that his right to a bonus became vested upon his performance of the bargained-for consideration, i.e. his medical services, and that the Agreement does not contain the clear and unequivocal language necessary to work a forfeiture of the bonus.

MOI countered with its own motion, arguing that the plain language of the Agreement does not provide for post-resignation bonus payments. MOI claims Highhouse had to remain employed with MOI in order to receive his bonus, or conversely, he forfeited his right to bonus payments by resigning his position with MOI. MOI argues on appeal, as it did before the trial court, that because the Agreement made no provision for bonus payments after resignation, Highhouse was not entitled to any. As support, MOI designated an affidavit from its CEO stating that he had never discussed with Highhouse "that he would be entitled to receive payments after his termination. In the eleven-year history of MOI, we have never given or negotiated with physician employees for payments after termination." (Appellant's App. p. 75). Further, MOI designated an affidavit executed by its accountant stating that, in his opin-

ion, "to a reasonable decree [sic] of certainty in my field, employed physicians such as Dr. Highhouse are not given payments after termination which are based upon the outstanding accounts receivable of the employer unless there is a very specific provision in the employment agreement to that effect." (Appellant's App. p. 77).

■ This controversy stems from the Agreement's failure to provide a specific contingency in the event Highhouse voluntarily resigned. Highhouse asserts, and MOI does not dispute, that his right to the bonus payments became vested at the time he performed the services upon which the bonus payments are based. We agree. *See Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 47 (Ind.Ct.App.1983) ("when the services are rendered, the right to receive the promised compensation is vested . . . .") The forfeiture of a vested right requires unambiguous language to that effect, as demonstrated in *Robinson,* where we held that a former employee was not entitled to post-termination payments for commissions earned prior to her departure from her employer, because she had signed three separate employment agreements, each of which clearly specified that "[n]o commission is payable to an employee who is not employed at the time the invoice is paid and the money has been received by Century." *Id.* at 1269. The contract provisions at issue in *Robinson* contained the clarity of language required to support a finding of forfeiture.

■ As *Robinson* instructs, forfeiture provisions "will be enforced where the contract clearly requires, but if there is doubt we favor the construction avoiding a forfeiture." *Colonial Mortgage Co. of Indiana, Inc. v. Windmiller,* 176 Ind.App. 535, 376 N.E.2d 529, 532 (1978). To prevail, therefore, MOI must identify similarly unambiguous language in its own Agreement. Oth-

erwise, its claim of forfeiture fails. For this reason, affidavit testimony regarding company or industry standards cannot substitute for the requisite clarity of language and, hence, they are irrelevant. *See Sample,* 700 N.E.2d at 804.

In the absence of a specifically applicable contract term, MOI seeks to find support for its position elsewhere in the Agreement. MOI posits that Paragraph 9 provides an answer to this dilemma. Set forth in full above, Paragraph 9 is captioned *"Termination without Cause"* and provides that MOI could terminate the Agreement "at any time and without cause effective upon ninety (90) days advance written notice," in which case Highhouse would "continue to render his services," and "be paid his regular compensation up to the date of termination." (Appellant's App. p. 21). MOI no doubt wants Highhouse's resignation to fit under Paragraph 9 of the Agreement because that paragraph arguably precludes any post-termination payments.

Specifically, MOI contends that Highhouse must have submitted his resignation pursuant to Paragraph 9 of the Agreement because he gave MOI ninety days advance notice. MOI reasons: "How else would [Highhouse] have known that 90 days notice was required?" (Appellee's Brief p. 7). MOI's argument rests on the *non sequitur* that because Highhouse tendered his resignation ninety days in advance, he must have tendered his resignation pursuant to Paragraph 9. The first three words of that paragraph, however, "Employer may terminate," clearly applies to an involuntary termination instigated by MOI, not a voluntary resignation by Highhouse. Thus, we refuse MOI's invitation to infer that because Highhouse gave ninety days advance notice, his resignation fell within the purview of Paragraph 9.

 Having determined that Paragraph 9 does not apply to the instant situation, and not having been directed to any other applicable provision, we look to the Agreement as a whole for any indication as to the parties' intent with respect to the payment of post-resignation bonuses. *Robinson*, 678 N.E.2d at 1270. We "attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties." *Id.* Wherever possible, we construe the Agreement's language so as to harmonize its various provisions without rendering any words, phrases, or terms ineffective or meaningless. *Id.*

Having reviewed the entire Agreement, we find another provision that sheds significant light on this issue. Specifically:

18. *Restrictive Covenants.* Employee acknowledges that if he were to compete with Employer in the practice of orthopaedic medicine, he could cause serious harm to Employer.... Consequently, if Employee breaches this restrictive covenant, Employer shall be entitled to injunctive relief in addition to any and all remedies available at law, and *Employee shall forfeit all claims or rights to any of the accounts receivable of the corporation.*

(Appellant's App. p. 26) (emphasis added). This paragraph unequivocally indicates that the payment of post-resignation bonuses, based on accounts receivable accruing pre-resignation, is the *quid pro quo* for Highhouse's compliance with the Agreement's covenant-not-to-compete clause. Conversely, Highhouse would forfeit his right to post-resignation bonuses by violating the Agreement's non-compete provision. We find this to be a clear indication that Highhouse was entitled to bonus payments after leaving MOI's employment, provided he did not practice in violation of his obligation under the Agreement.

Most importantly, however, the Agreement does not contain any language, ambiguous or otherwise, that would have alerted Highhouse that a voluntary resignation from his position with MOI would result in a forfeiture of the agreed bonus. As stated above, a contractual intent to forfeit such payments must be evidenced by clear language to that effect. *Colonial Mortgage*, 376 N.E.2d at 532. In essence, once MOI failed to designate a contractual provision clearly evidencing a forfeiture of the bonus due to Highhouse's voluntary resignation, such as the ones found in *Robinson, supra,* the trial court had to find in favor of Highhouse. Therefore, the trial court erred in holding to the contrary.

### III. Whether Highhouse's bonus constituted a "wage" under the Wage Payment Statute

 Highhouse contends that his annual bonus constitutes a wage that MOI had to pay within the time frame set forth in Ind.Code § 22-2-5-1(b). If it does, then an award of liquidated damages is mandatory. *Valadez v. R.T. Enterprises, Inc.,* 647 N.E.2d 331, 333 (Ind.Ct.App. 1995) ("[T]he plain language of the statute makes no exception[.]"). I.C. § 22-2-5-1, the Wage Payment Statute states, in pertinent part:

(b) Payment shall be made for all wages earned to a date not more than ten (10) days prior to the date of payment.... However, if an employee voluntarily leaves employment, either permanently or temporarily, the employer shall not be required to pay the employee an amount due the employee until the next usual and regular day for payment of wages, as established by the employer.

An employer's failure to comply with the Wage Payment Statute subjects it to the following statutory penalties:

Sec. 2. Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due, and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys.

I.C. § 22–2–5–2. We have previously observed that I.C. § 22–2–5–2, as a penal statute in derogation of common law, must be strictly construed. *Fardy v. Physicians Health Rehabilitation Services, Inc.*, 529 N.E.2d 879, 881 (Ind.Ct.App.1988). In *Fardy,* we dissected the Wage Payment Statute into three distinct requirements, the third of which applies to the present case: "Employees, upon separation from employment, must be paid the amount [of wages] due them at their next and usual payday." *Id.* at 882.

Thus, the proper outcome in this case turns on whether the bonus payments provided for in the Agreement constitute a "wage" for purposes of the Wage Payment Statute. Unfortunately, the Wage Payment Statute does not define "wages." In prior decisions, however, we have looked to the definition of "wages" contained in a companion statute, I.C. § 22–2–9–1(b): "The term 'wages' means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method

of calculating such amount." *See Gurnik v. Lee,* 587 N.E.2d 706, 709 (Ind.Ct.App. 1992). In *Gurnik,* we determined that an employee's contractual bonus qualified as a "wage" despite being denominated as a "bonus," because the employee's bonus related directly to the time she worked; was paid on a regular, periodic basis; and was not predicated on the financial success of the employer. *Id.* at 710. In so holding, we rejected the employer's formalistic approach of automatically excluding all compensation denominated as a "bonus" from the definition of "wages" because "the mechanical exclusion of all compensation labeled as a 'bonus' from the scope of Sections 1 and 2 would allow employers to escape the statutory penalties by merely labeling compensation as 'bonuses.'" *Id.* at 709.

To the contrary, in *Wank v. Saint Francis College,* 740 N.E.2d 908, 912 (Ind.Ct. App.2000) *trans. denied,* we determined that the severance package at issue was not a wage because it was a gratuitous payment made to acknowledge Wank's years of service. Neither the terms of Wank's employment with St. Francis, nor a written policy, provided for payment of severance benefits. In *Pyle v. National Wine & Spirits Corp.,* 637 N.E.2d 1298, 1300 (Ind.Ct.App.1994), we applied the same rationale to likewise determine that a company bonus did not constitute a wage because it was not linked to the amount of work done by the employee, but instead depended upon the company's financial success. *Id.*

In the present case, Highhouse argues that the bonus constitutes a wage under the above authorities because "it was compensation Dr. Highhouse received on a regular, periodic basis, in accord with the amount of work he performed as an MOI employee." (Appellant's Br. p. 16). MOI

counters that the bonus could not possibly be construed as a wage because it "was contingent upon MOI's success in holding down expenses which were clearly beyond Appellant's control." (Appellee's Br. p. 9). MOI identifies these expenses as rent, office supplies, business and accounting expenses, and other costs of doing business. "While Appellant could, in some respects, control his productivity and personal expenses, the fixed and variable expenses were wholly outside of his control." *Id.* For this reason, MOI argues, Highhouse "was not compensated through his bonus for work done." (Appellee's Br. p. 11).

Here, we need only look to the Agreement to determine that Highhouse's annual bonus was as much a part of his regular compensation as his wages. In addition, the Agreement utilizes mandatory language: the "Employer shall also pay an annual bonus to Employee based upon Employee's productivity ..." (Appellant's App. p. 17). Moreover, even if we were to consider the relevant factors mentioned in *Lee, supra* and *Wank, supra,* among others, we would come to the same conclusion, because the bonus relates directly to the services Highhouse performed, and were made at regular intervals according to a predetermined schedule. Just because the bonus money was paid quarterly, instead of monthly, does not alter its character as compensation for Highhouse's services. *Wank,* 740 N.E.2d at 912 ("Deferred payment of compensation that accrued during an employee's tenure is a wage.").

The factors MOI contends militate against construing the bonus as a wage, i.e. rent, office supplies, business and accounting expenses, and other costs of doing business, are merely factors to be considered in determining the amount of the bonus. Because of the Agreement's clear language identifying the bonus as part of Highhouse's compensation, we refuse

MOI's invitation to use these same items to write the bonus out of the Agreement. *See George S. May Intern. Co. v. King,* 629 N.E.2d 257, 260 (Ind.Ct.App.1994) ("In construing a contract we may not rewrite it to suit one party, but must apply the plain and obvious meaning of the language of the entire contract.").

Therefore, the trial court erred by not granting Highhouse partial summary judgment on his claim that the Agreement's bonus payments qualified as a "wage" under the Wage Payment Statute.

## CONCLUSION

Accordingly, we hold that the trial court erred by granting summary judgment in favor of MOI and against Highhouse on his claim for bonus payments under the Agreement, and for damages under I.C. § 22–5–2–2.

Reversed and remanded for calculation of damages.

ROBB, J., concurs.

MATTINGLY–MAY, J., dissents with separate opinion.

MATTINGLY–MAY, Judge, dissenting.

Because many of the factors that determine the amount of Highhouse's bonus are unrelated or related only indirectly to services he performed for MOI, I believe there is a question of fact regarding whether Highhouse is entitled to the bonuses after his resignation, and if so, in what amount. Partial summary judgment for Highhouse is therefore improper and I must respectfully dissent.

I agree with the majority's general premise that an employee's right to a bonus becomes vested "at the time he performed *the services upon which the bonus payments are based.*" Op. at 1011, emphasis supplied. Highhouse's bonus is

based on four factors, but only one, "Employee's productivity," (App. to Br. of Appellant at 60), appears to be directly related to the services Highhouse performed for MOI. The other three factors that determined the amount of the bonus are "collection of accounts, office expenses for the offices located in Richmond, Indiana, and Connersville, Indiana, and the net income" of those offices. *Id.* Those three factors appear either unrelated to the work Highhouse performed or only indirectly related.

More specifically, the Agreement defines one of the four factors, "net income," as the gross receipts MOI collects that "are attributable to professional services rendered by *all physicians* of [MOI] at *all locations*, reduced by the ordinary and necessary business expenses which are attributable to the operation of *all business locations* of [MOI]." *Id.* (emphasis supplied).[3] Furthermore, while Highhouse's activities as an employee might have had some indirect impact on MOI's ability to collect its accounts and on its office expenses, the record does not reflect whether or to what extent those two factors depended on Highhouse's performance.

Because the designated evidence gives rise to a genuine issue of material fact as to whether or to what extent Highhouse "performed the services upon which the bonus payments are based," I believe summary judgment for Highhouse is improper.

The majority's decision is further premised at least in part on its determination that Highhouse's bonus was a "wage." I do not believe it can be so characterized, and summary judgment for Highhouse is improper for that reason as well. The majority correctly notes that a payment denominated as a "bonus" may in fact be part of an employee's "wage" if it is compensation in addition to the employee's salary, is paid on a regular, periodic basis, is related directly to the time worked, and is not predicated on the financial success of the employer. *Gurnik*, 587 N.E.2d at 709.

While Highhouse's bonus satisfies some of the *Gurnik* factors, it was explicitly predicated in part on the financial success of MOI. I would therefore decline to characterize the bonus as part of Highhouse's "wage" insofar as the bonus amount is based on MOI's collection of accounts and office expenses and is "attributable to professional services rendered by *all physicians* of [MOI] at *all locations*" where MOI operated.

I would remand for a trial on the merits.

---

3. Highhouse does not mention in his brief the language of this provision of the Agreement. Rather, he describes the bonus as "based upon MOI's collections of fees attributable to his services, minus certain expenses." (Br. of Appellant at 3.) He also states "MOI did not consider the profitability or production of any office, or any other person, in calculating Dr. Highhouse's annual bonus." *Id.* Highhouse does not address the apparent inconsistency of this characterization with the explicit language of the Agreement.