

FILED

Nov 21 2017, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Darlene R. Seymour
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory E. Steuerwald
Graham T. Youngs
Steuerwald, Hannon & Witham, LLP
Danville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robin King,<br>*Appellant*,<br><br>v.<br><br>Rebecca Conley,<br>*Appellee*. | November 21, 2017<br><br>Court of Appeals Case No.<br>32A01-1612-PL-2670<br><br>Appeal from the Hendricks Circuit Court<br><br>The Honorable Daniel F. Zielinski, Judge<br><br>Trial Court Cause No.<br>32C01-1606-PL-69 |

**Brown, Judge.**

[1] Robin King appeals from an order of the trial court which denied her motion for eviction of Rebecca Conley and granted Conley's request for specific performance. King raises one issue which we revise and restate as whether the trial court's order is clearly erroneous. Conley requests appellate attorney fees. We affirm and remand for determination of appellate attorney fees.

## Facts and Procedural History

[2] In the summer of 2015, Vince Wall, a real estate broker, assisted Conley in finding a home and located the residential property owned by King. King and Conley entered into two agreements dated December 16, 2015, specifically, a lease agreement (the "Lease") and an Option to Purchase Real Estate (the "Option Agreement") pursuant to which King granted Conley an exclusive and irrevocable option (the "Option") to purchase the residential home and real estate.[1] Conley paid King $13,000 pursuant to the Option Agreement.

[3] The Lease provided that Conley, as the tenant, agreed to lease the residential property from King, as the landlord, for a term commencing on December 19, 2015, ending on December 18, 2016. Paragraph 4 of the Lease, which was titled "alterations and maintenance of lease premises," provided in part:

---

[1] Wall testified that he initially wrote a land contract for Conley to purchase the property in accordance with King's terms. He also testified that he advised King he was not an attorney and did not represent her, that he represented Conley, and that if she needed advice she needed to speak with an attorney or her realtor, that King did talk to an attorney, and that her attorney "restructured" the agreement and that "instead of a land contract, it became a lease, and then a separate option to purchase in return for a payment of thirteen thousand dollars." Transcript at 13. He indicated that King's attorney prepared the Lease and the Option Agreement.

> Tenant shall not cause or permit any alterations, additions or changes to the Leased Premises without first obtaining the written consent of Landlord. All approved alterations, additions or changes to the Leased Premises shall be made by Tenant in accordance with all applicable laws and shall become the property of Landlord. Tenant shall be responsible for maintaining the interior and exterior of the house, and the ground of the premises, including minor and routine repairs. . . .

Defendant's Exhibit A. Paragraph 11 of the Lease defined Events of Default. Paragraph 15 of the Lease provided in part that King and her agents would be permitted to inspect and examine the leased premises "at all reasonable times" and that King would have the right to make any repairs to the premises she may deem necessary. *Id.*

[4] The Option Agreement provided, "[i]n consideration of the non-refundable payment of Thirteen Thousand dollars ($13,000) (the 'Option Money'), and for other good and valuable consideration, [King] does hereby grant to [Conley] the exclusive and irrevocable option [(the 'Option')] to purchase the residential home and real estate . . . ." Defendant's Exhibit B. Conley's right to exercise the Option commenced on December 19, 2015, and terminated on December 18, 2016. The Lease and Option Agreement provided that, if Conley was in default under the Lease, King could terminate the Option Agreement. Both the Lease and Option Agreement provided for attorney fees.

[5] On March 17, 2016, Conley reported a leak to King and provided the code to the garage so that King could access the house, and King noticed water in the sump was gone. King made a statement to Wall that the problem might have

been caused by Conley, the statement concerned Conley, and Conley decided that King was not permitted to enter the house unless another person was present. Ultimately, King or contractors were given access on March 18th and 22nd and the sump pump was replaced. Conley changed the lock on the front door on or after March 20th.

[6] In a letter dated March 25, 2016, Conley notified King that she was exercising her Option to purchase the property pursuant to the Option Agreement. In a letter to Conley dated March 30, 2016, King stated that Conley had painted the majority of the ground level interior walls, replaced door lock(s) on the house, and removed at least three hosta plants from the yard without written consent in violation of Paragraph 4 of the Lease, and denied King access to the property on several dates from March 18 to 25, 2016, in violation of Paragraph 15 of the Lease. The letter stated that Conley was required to correct the violations within fifteen days and also offered to waive the violation corrections if Conley agreed to exercise the Option on or before the deadline for the corrections, the closing would occur within thirty days, and the property would be sold in an "as is" condition and that no repairs would be made to the property.

[7] In June 2016, King filed a complaint alleging that Conley was in breach of the Lease and had painted certain interior walls, changed the door locks, and denied King access. On August 15, 2016, Wall and King walked through the rooms of the house together so that King could inspect the home and take photographs. When they had finished, Wall asked King if she was satisfied with the property, King replied affirmatively, Wall then asked if the visit

resolved her request to have access, and King again replied affirmatively and stated "well I guess I can go ahead and drop everything, uh because I have been granted access." Transcript at 29.

[8] On August 19, 2016, King filed a motion for eviction which alleged that Conley was in breach of the Lease and requested a hearing. Conley filed an answer, affirmative defenses, and a counterclaim for specific performance of the Option. In her counterclaim, Conley alleged that she had exercised the Option, that she had applied for and obtained the financing necessary to close as shown in an attached exhibit, and requested specific performance requiring King to close the transaction and attorney fees.

[9] On November 9, 2016, the court held a hearing and heard the testimony of King, Conley, and Wall and admitted the parties' agreements and letters to each other as well as text messages between King and Conley. King testified that Conley continued to pay rent and had never missed a monthly payment. On November 30, 2016, the court issued its Findings of Fact, Conclusions of Law, and Order. It found:

> 2. The parties entered into a written Lease Agreement on December 16, 2015, wherein [King] leased to [Conley] certain real estate and improvements . . . (herein "Property"), for a term commencing on December 19, 2015 and ending on December 18, 2016.
>
> 3. At the same time, the parties executed an [Option Agreement] in which [Conley] made a non-refundable payment of $13,000 for the option to purchase the Property subject to certain written

terms and conditions. The Lease and Option Agreement was [sic] prepared by [King's] attorney.

4. The reason [King] was willing to lease her property with the Option to Purchase was because of her intent to move out of State to "help" her father. Thereafter, [King's] plans changed and she advised [Wall] she no longer wanted to sell her property.

5. Wall advised [King] that she would have to sell if [Conley] exercised her Option.

6. In January and February of 2016, Wall had conversations with [King] about [Conley's] desire to exercise the Option.

7. In mid-March, 2016, the sump-pump located at the Property broke causing flooding in the basement of the Property.

8. [King] and [Conley] exchanged text messages thereafter wherein [King] requested permission to stop by and see the damage. [Conley] responded that [King] could "go in any time" and gave [King] the code to the garage.

9. Between March 17th and March 18th, [Conley] learned that [King] had suggested that the flooding might have been caused by [Conley's] "negligence." This caused the parties' relationship to become strained. On March 20, 2016, [Conley] purchased a deadbolt lock from Lowe's. [Conley] changed the lock on the front door because she felt "uncomfortable." Additionally, [Conley] wanted to be at the premises when strangers were there.

10. On March 25, 2016, [Conley] sent [King] a letter formally exercising her Option to purchase the Property.

11. Paragraph 4 of the Lease also states that "[Conley] shall be responsible for maintaining the interior and exterior of the house, and the grounds of the premises, including *minor and routine repairs*."

12. On March 30, 2016, [King] sent [Conley] a letter with a subject "Notice of Lease Violation" listing, in relevant part, two reasons for default: [Conley] painted the interior walls and replaced the front door lock. Prior to that in February, 2016, [Conley] sent a text message to Landlord advising her of the change in paint color and [King] responded "I am sure I will be envious. Always wanted to paint and never got to it. LOL!"

13. No written Notice of an alleged breach of the Lease was served on [Conley] before [Conley] sent [King] a letter exercising the Option.

14. [Conley] never missed a single monthly rent payment.

Appellant's Appendix Volume 2 at 9-11. Under the heading "Conclusions of Law," the order provides in part:

3. The term "alteration" is not defined by the Lease Agreement, is therefore ambiguous, and therefore the Court adopts its usual and common meaning as defined by Black's Dictionary as follow[s]:

> A substantial change to real estate, especially to a structure, usually not involving an addition to or removal of the exterior dimensions of a building structure's parts. Although any addition to or improvement of the real estate is by its very nature in alteration, real estate lawyers habitually use alteration in reference to a lesser change. Still, to constitute an alteration, the change must be substantial – not simply a trifling modification.

* * * * *

5. In determining whether a breach of contract was material, the following five factors are considered: 1) The extent to which the injured party will be deprived of the benefit which he reasonably expected; 2) The extent to which the injured party can be

adequately compensated for the part of the benefit of which he will be deprived; 3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture; 4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and 5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

6. It is clear from the evidence that [King] intended to move out of State and therefore was anxious to lease her property with the hopes that it may sell. It was not until after [King] decided not to move and after she received notice of intent to exercise the Option did [King] allege breach.

7. The Court finds that the painting of walls and the changing of exterior locks is not a material breach of the contract. In fact, the evidence was that [King] did not initially take issue with the painting of the walls (quite contrary) and [Conley] did not unreasonably deny access of the Property to [King]. [Conley's] reason for changing the locks was reasonable and [King] was not unreasonably denied access. Any reason for the denial of access was due to [Conley's] inability to be at the Property at the time [King] wanted to have an inspection, and, in any event, such delay was only a matter of hours. And additionally, again, [King] did have the access code to the garage.

* * * * *

10. [Conley] timely submitted to [King] a written notice of intent to exercise Option and she was in a substantial compliance with the Lease on that date. Court finds that [Conley's] request for specific performance should be granted.

11. [Conley] is not in breach of Lease and is entitled to specific Performance.

*Id.* at 12-14. The court denied King's motion for eviction, granted Conley's request for specific performance of the Option Agreement, and ordered King to close on the transaction on December 2, 2016. It also granted Conley's request for attorney fees. The court later entered an order which stayed its November 30th order subject to King posting an appeal bond or irrevocable letter of credit and naming Conley as an insured on the property.

## *Discussion*

[10] The issue is whether the trial court's order denying King's motion for eviction and granting Conley's request for specific performance is clearly erroneous. The trial court entered findings of fact and conclusions. We may not set aside the findings or judgment unless they are clearly erroneous. *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 158 (Ind. 2016). In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not defer to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* Clear error occurs when our review of the evidence most favorable to the judgment leaves us firmly

convinced that a mistake has been made. *Salser v. Salser*, 75 N.E.3d 553, 558 (Ind. Ct. App. 2017).

[11] King claims that the court's order denying her motion for eviction is clearly erroneous and that the record shows Conley intentionally and continually violated the Lease by changing the locks and denying her access to the property. King states that she provided Conley with notice that she violated the Lease on March 30, 2016, and argues that all of Conley's violations were curable and that Conley chose to ignore the request to cure causing an Event of Default. Conley responds that she was in full compliance with the Lease when she exercised her Option, that even if she breached the Lease it was not a material breach warranting forfeiture of the Option, and that, even if there were a material breach, she exercised her Option before receiving notice and an opportunity to cure any defect under the Lease.

[12] Indiana courts have recognized the contractual nature of leases and the applicability of the law of contracts to leases. *Stewart v. TT Commercial One, LLC*, 911 N.E.2d 51, 55 (Ind. Ct. App. 2009) (citations omitted), *trans. denied*. Interpretation of a contract presents a question of law and is reviewed *de novo*. *Id*. When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties. *Id.* at 56. This requires the contract to be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

[13] An option to purchase real estate is a contract by which the owner of the realty agrees with another person that the latter shall have the power to purchase such property at a fixed price within a certain period of time. *Pinkowski v. Calumet Twp. of Lake Cty.*, 852 N.E.2d 971, 981 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*. By an option, the owner subjects himself to the liability of having to convey the property if the option is exercised within the time and in the manner stipulated. *Id.* By failing to comply with the option's terms, the option holder deprives himself of the right to demand the enforcement of the contract. *Id.* When a party exercises an option to purchase, recitation of the exact terms of the agreement is not necessary. *Id.* Only essential terms need be included to render a real estate option contract enforceable. *Id.* Indiana courts order specific performance of contracts for the purchase of real estate as a matter of course. *Id.* Courts readily order specific performance with regard to real estate purchases because each piece of real estate is considered unique. *Id.* A party seeking specific performance of a real estate contract must prove that she has substantially performed or offered to do so. *Id.* at 982.

[14] To the extent King claims Conley was in breach of the Lease and thus not entitled to specific performance, we note that Section 1.6 of the Option Agreement provides that, if at any time Conley is in default of the Lease, then King may terminate the Option Agreement. According to Paragraph 11 of the Lease, an "Event of Default" included "[t]he failure to pay any installment of rent when the same becomes due and the failure continues for fifteen (15) days" and Conley's "failure to perform or observe any other covenant, term or

condition of this lease to be performed or observed by [Conley] and if curable, the failure continues for fifteen (15) days after notice thereof is given to [Conley]." Defendant's Exhibit A. The evidence establishes that Conley did not fail to pay any installment of rent when it became due. The evidence also supports the trial court's finding that, at the time Conley exercised the Option, King had not yet served Conley with notice of any failure to perform a term of the Lease. The Lease required that Conley be given fifteen days after notice was given to her of a violation of the Lease to cure any noncompliance before an Event of Default was deemed to have occurred. The determination that Conley exercised her Option before the occurrence of any Event of Default under the Lease is not clearly erroneous. *See Fetz v. Phillips*, 591 N.E.2d 644, 648 (Ind. Ct. App. 1992) (observing that the tenants failed to maintain liability insurance and to pay the property taxes as required under the lease and that the lease provided the landlord was required to provide the tenants notice of noncompliance and the landlord never did so; holding that, because notice was necessary before the lease and option could be cancelled, the option remained valid even though the tenants failed to comply with two requirements under the lease; and affirming summary judgment in favor of the tenants' action seeking specific performance of their option to purchase); *see also Pinkowski*, 852 N.E.2d at 984 (finding that, because the rent was paid within the thirty days after notice was sent in accordance with correspondence and any alleged arrearage was cured by the payment, the prerequisite to exercising an option to purchase was satisfied and thus the appellee properly exercised the option).

In addition, the evidence supports the trial court's findings that the painting of the walls and the changing of the lock did not constitute a material breach of the Lease and that Conley was in substantial compliance with the Lease when she exercised the Option. Paragraph 4 of the Lease provided that Conley would not cause any alterations, additions, or changes to the premises without obtaining King's written consent, and Paragraph 15 provided that King would be permitted to inspect and examine the premises at all reasonable times. Black's Law Dictionary defines an alteration to be "[a] substantial change to real estate" and states, "[a]lthough any addition to or improvement of real estate is by its very nature an alteration, real-estate lawyers habitually use *alteration* in reference to a lesser change" and "[s]till, to constitute an alteration, the change must be substantial — not simply a trifling modification." BLACK'S LAW DICTIONARY 94 (10th ed. 2014). We construe any contract ambiguity against the party who drafted it. *Time Warner Entm't Co., L.P. v. Whiteman*, 802 N.E.2d 886, 894 (Ind. 2004), *reh'g denied*. "As a general rule, an express provision in a lease that allows the breach of a covenant to work a forfeiture of the agreement, is enforced if the breach is material." *Page Two, Inc. v. P.C. Mgmt., Inc.*, 517 N.E.2d 103, 107 (Ind. Ct. App. 1987). In determining whether a breach is material, the following factors may be considered:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Frazier v. Mellowitz*, 804 N.E.2d 796, 803 (Ind. Ct. App. 2004) (citing the RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)).

[16] The evidence shows that, when Conley sent a text message to King stating "[y]ou need to stop by sometime and see the painting I've done inside the house," King replied by sending a text message to Conley stating: "Sure!! I am sure I will be envious. Always wanted to paint and never got to it. Lol!" Defendant's Exhibit F. Conley also sent text messages to King containing several photographs of the painted walls. Conley testified that she had correspondence through other text messages with King about painting the house and there was no objection from her. Conley testified that she was employed as a flight attendant, there were times it was difficult to make arrangements to be home, and that she always provided reasonable access for King. King testified that Conley contacted her by text message on March 17th about a leak. King sent a text message to Conley on March 17th stating that a claim was filed, that she would be in touch as soon as she heard from the insurance company, and that she would like to stop by in the afternoon, and

Conley replied with a text message stating that King could go in any time and providing the code to the garage. King accessed the house on March 17th while Conley was not home and noticed that water in the sump was gone.

[17] The court heard testimony that King mentioned to Wall that the problem in the basement might have been caused by Conley's negligence and that Wall in turn told Conley about King's comment. Conley testified that she became very concerned about King's statement. The court heard testimony that King arrived at the property on the morning of March 18th, that Conley did not let her in at that time, and that King called the police. Conley testified that she did not feel comfortable with the situation, would not let King in until she knew her rights, and had texted King. The court heard testimony that Wall arranged to be at the property at 4:30 p.m. that day and stayed for three hours to make sure that access was granted, that King visited the property and was allowed in the house, and that, when Wall did leave the property, the contractor was still there working. Conley testified she purchased a lock on March 20th and sometime after that changed the lock to the front door because King was asking to enter at certain times when she was not present. Wall testified that King was allowed in, but only with another person being there, and that Conley felt that the only way she would feel comfortable was if somebody else was present. On March 22nd, a plumber or contractor replaced the sump pump. Wall testified that he was also present for King to inspect the property on August 15th, that King went room to room snapping photographs, that he asked her to stop taking photographs of personal items, he asked King if she was satisfied with the

property and she replied affirmatively, and he asked her if the visit resolved her request to have access and she again replied affirmatively.

[18] Our review of the evidence based on the Restatement considerations does not leave us firmly convinced that a mistake has been made. King did not suffer significant loss due to the painting or changing of the lock, King granted Conley the Option in consideration of a non-refundable payment of $13,000, and the painting of the interior walls and the changed lock became a part of the property subject to the Lease and the Option Agreement. The Restatement factors, taken together under these circumstances, favor the conclusion reached by the trial court that Conley's actions of painting the interior walls and changing a lock did not constitute a material breach of the Lease. *See Page Two*, 517 N.E.2d at 108 (finding the factors set forth in § 275 of the Restatement of Contracts reasonably supported the trial court's determination that any breach of a covenant to maintain insurance upon the premises was not sufficiently material to justify termination of the lease),[2] *reh'g denied*.

[19] We additionally observe that Conley made a non-refundable payment to King of $13,000 in consideration for the Option and that any alterations to the leased premises would become part of the property which, if Conley exercised her Option as she did, would be retained by Conley together with any such

---

[2] *Page Two* cites the original Restatement of Contracts § 275. However, the Restatement (Second) of Contracts § 241 has since been adopted. *Collins v. McKinney*, 871 N.E.2d 363, 375 n.4 (Ind. Ct. App. 2007) (citing *Frazier*, 804 N.E.2d at 802-804). The considerations listed in the Restatement (Second) of Contracts § 241 are similar to those listed in the Restatement of Contracts § 275.

alterations. We note that contract provisions resulting in forfeiture are generally disfavored, *see Colonial Mortg. Co. of Ind. v. Windmiller*, 176 Ind. App. 535, 540, 376 N.E.2d 529, 532 (1978) (noting, in interpreting a contract, that the law views forfeiture provisions with disfavor and that "if there is doubt we favor the construction avoiding a forfeiture"), and that, to the extent there is doubt as to whether the painting and changing of a lock amounted to a material breach which would result in the forfeiture of Conley's payment and her right to exercise the Option, we favor the interpretation avoiding the forfeiture. We also construe any ambiguity as to whether the painting and changing of the lock amounted to a breach or a material breach of the Lease against King as the party who prepared the Lease. *See Time Warner*, 802 N.E.2d at 894.

[20] Giving due regard to the trial court's ability to assess the credibility of witnesses and noting we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment, we cannot conclude that the record contains no facts to support the trial court's findings either directly or by inference. The trial court's findings and conclusions that Conley was not in material breach of the Lease and was entitled to specific performance of the Option Agreement are not clearly erroneous, and it did not err in denying King's motion for eviction.

[21] Conley also requests appellate attorney fees. When a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded. *Kishpaugh v. Odegard*, 17 N.E.3d 363, 377 (Ind. Ct. App. 2014). Here, both the Lease and Option Agreement provide for attorney fees. Paragraph 14

of the Lease provides that each party shall pay the other party's reasonable legal costs and attorney fees incurred in successfully enforcing against the other party any covenant, term, or condition of the Lease, and Section 6.6 of the Option Agreement provides that, "[i]n connection with any litigation, including appellate proceedings, arising out of or in connection with this Option to Purchase, the prevailing party shall be entitled to recover reasonable attorney's fees and costs from the other party." Defendant's Exhibit B. Accordingly, we remand to the trial court for determination of reasonable appellate attorney fees.

## Conclusion

For the foregoing reasons, we affirm the order of the trial court and remand for determination of reasonable appellate attorney fees.

Affirmed and remanded for determination of appellate attorney fees.

May, J., and Pyle, J., concur.