ATTORNEYS FOR APPELLANT/CROSS-APPELLEE,
STATE OF INDIANA, ACTING ON BEHALF OF THE
INDIANA FAMILY AND SOCIAL SERVICES
ADMINISTRATION

Peter J. Rusthoven
John R. Maley
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE/CROSS-APPELLANT,
INTERNATIONAL BUSINESS MACHINES CORPORATION

Jay P. Leftkowitz
Steven J. Menashi
Kirkland & Ellis LLP
New York, New York

Steven D. McCormick
Jonathan C. Bunge
Daniel R. Lombard
Kirkland & Ellis LLP
Chicago, Illinois

Andrew W. Hull
Daniel K. Burke
Hoover Hull LLP
Indianapolis, Indiana



FILED

Mar 22 2016, 12:03 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 49S02-1408-PL-00513

STATE OF INDIANA,
Acting on Behalf of the Indiana Family &
Social Services Administration,

*Appellant/Cross-Appellee*
*(Plaintiff/Cross-Defendant below),*

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

*Appellee/Cross-Appellant*
*(Defendant/Cross-Plaintiff below).*

Appeal from the Marion Superior Court, No. 49D10-1005-PL-021451
The Honorable David J. Dreyer, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1211-PL-00875

1

**David, Justice.**

This case involves a $1.3 billion Master Services Agreement ("MSA") entered into between the State of Indiana, acting on behalf of the Family and Social Services Administration, ("State") and International Business Machines, Corp. ("IBM") to modernize and improve Indiana's welfare eligibility system. Although the MSA was supposed to last ten years, the State terminated it less than three years in, citing performance issues on the part of IBM. Both parties sued each other for breach of contract.

At issue is whether IBM's breach of the MSA was "material." The trial court found that the State failed to prove the breach was material, looking at the MSA as a whole, and in light of the benefits received by the State. The Court of Appeals majority reversed the trial court on this issue, finding that IBM's breach went to the "heart of the contract" which the Court of Appeals majority determined was defined by the policy objectives of the MSA. Both the trial court and the Court of Appeals majority cite to the common law Restatement (Second) of Contracts § 241 factors for analyzing the materiality of a breach. However, here, the MSA itself sets forth the standard for assessing the materiality of a breach. The MSA also provides performance standards and indicators to measure IBM's performance. The policy objectives of the MSA are incorporated into those performance standards. Consistent with Indiana's long tradition of recognizing the freedom to contract, we hold that when a contract sets forth a standard for assessing the materiality of a breach, that standard governs. Only in the absence of such a contract provision does the common law, including the Restatement, apply.

In this case, the contract provides that in order to terminate the MSA for cause, the State had to prove a breach or a series of breaches by IBM that were "material considering this Agreement as a whole[.]" (MSA § 16.3.1(1)(A), (C).) We hold that under the facts and circumstances of this case, looking at the performance standards and indicators provided in the MSA, IBM's collective breaches were material in light of the MSA as a whole. With the exception of its material breach analysis, we summarily affirm the Court of Appeals on all other issues.

Indiana Appellate Rule 58(A)(2)[1]. We reverse the trial court's finding that IBM did not materially breach the MSA and we remand to the trial court for calculation of the parties' damages consistent with this opinion, including any appropriate offsets.

**Facts and Procedural History**

During his first term, Governor Mitch Daniels announced that Indiana's welfare system was "broken" and "plagued by high error rates, fraud, wasted dollars, poor conditions for its employees, and very poor service to its clients." (Appellant's App. at 166.) Governor Daniels called it "America's worst welfare system." (Appellant's App. at 167.) Thus, beginning in late 2004, the Governor and senior officials began to plan a modernized system based on a "remote eligibility" model previously implemented in Texas. (Id.) This new system would allow Indiana citizens to apply for welfare benefits "via web and call center" without the need for face-to-face meetings with a case worker, and eligibility determinations would be done on a centralized, statewide basis rather than in local county welfare offices. (Id.) The State sought vendors for this project and ultimately awarded it to IBM and a group of coalition companies (collectively "IBM").

On December 27, 2006, the State and IBM executed a 10-year, $1.3 billion Master Services Agreement ("MSA") in an effort to modernize and improve Indiana's welfare eligibility system. The MSA contains more than 160 pages plus extensive attachments, including 10 exhibits, 24 schedules and 10 appendices, which encompasses all aspects of the parties' working relationship. Generally, the MSA aimed to establish centralized service and call centers for the processing of welfare applications, enable remote electronic access to the system, provide the State a paperless document system, create systems to combat fraud and improve Indiana's poor welfare-to-work record and lower administrative costs.

To that end, the MSA set forth the various "Policy Objectives" for the modernization effort, which include, in pertinent part:

---

[1] Indiana Appellate Rule 58(A)(2) authorizes the Supreme Court to summarily affirm "opinions or portions thereof."

3

(1) (i) to provide efficient, accurate and timely eligibility determinations for individuals and families who qualify for public assistance, (ii) to improve the availability, quality and reliability of the services being provided to Clients by expanding access to such services, decreasing inconvenience and improving response times, among other improvements, (iii) to assist and support Clients through programs that foster personal responsibility, independence and social and economic self-sufficiency, (iv) to assure compliance with all relevant Laws, (v) to assure the protection and integrity of Personal Information gathered in connection with eligibility determination, and (vi) to foster the development of policies and procedures that underscore the importance of accuracy in eligibility determinations, caseload integrity across all areas of public assistance and work and work-related experience for Clients in the Programs.

(Appellant's App. at 567.) The MSA also provides that when construing and interpreting provisions and terms of the MSA, "[i]n the event of any uncertainties" or in the event of any "ambiguity, vagueness, or inconsistency" the "provisions and terms shall be read in a manner consistent with the Policy Objectives." (MSA § 1.4.) However, the MSA also provides that:

[n]otwithstanding the foregoing, in no event shall the Policy Objectives change or expand [IBM]'s obligations hereunder unless expressly agreed to by the Parties pursuant to a Change.

(MSA § 1.4(5).)

Pursuant to the MSA, IBM's first obligation was to assist the State in processing social service applications under the State's existing procedures in all Indiana counties. Then, the modernized system was to be rolled out in phases on a region-by-region basis according to a "preliminary," "initial Transition Timeline." (MSA § 3.2.1(2).) Finally, once the modernized system was in place in all counties, the project would reach the final stage, "Steady State." (MSA § 3.2.1(1).)

The MSA sets forth various standards and measurements in order to assess IBM's performance. It provides that IBM's satisfactory performance will be measured by the following eight standards:

4

1) Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;

2) Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;

3) Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];

4) Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Article 9 (with all results of such Audits being addressed in accordance with the Governance Plan);

5) Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);

6) Timeliness, completeness, and accuracy of required reports;

7) Determination by the State of (i) [IBM]'s satisfactory performance of the Services and the Delegated Activities; and (ii) [IBM]'s satisfactory oversight and management of the Subcontractors; and

8) [IBM]'s efforts to assist the State in achieving the Policy Objectives.

(MSA § 3.8.2.)

The MSA also provides four categories of performance standards that are associated with specific monetary consequences (liquidated damages) in the event they are not met:

1) Service Levels: the performance metrics, and associated penalties and incentives, that focus on [IBM]'s processing accuracy in administering the Programs and which impose more stringent measurements of the error rates than those currently applied.

2) Key Performance Indicators ("KPI" or "KPIs"): performance metrics, and associated penalties, designed to provide incentive to [IBM] to focus on other key metrics related to the Service components that are important to the State and its Clients.

3) Critical Transition Milestones: penalties imposed if [IBM] does not achieve the Critical Transition Milestones identified by the State that are critical to the successful transition of the Services.

4) Federal Penalties: penalties imposed by the Federal government, as set forth in Section 15.2.6 of the Master Services Agreement.

(MSA Schedule 10.) However, some of these metrics, for example, the Service Levels Metrics, were not applicable until Steady State, which never went into effect. Alternatively, some of the KPIs were accelerated by agreement of the parties in a Change Order.

Article 16 of the MSA provides that the State had the right to terminate the MSA for its own convenience or for cause. With regard to for cause termination, the State could terminate the MSA for cause in the case that there is a breach that is "material considering [the MSA] as a whole." (MSA § 16.3.1(1)(A).) The State could also terminate the MSA for cause when there is:

> a series of breaches of [IBM]'s obligations, none of which individually, constitutes a breach of this Agreement which is material considering this Agreement as a whole, but which, in view of [IBM]'s history of breaches, whether or not cured, collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole . . .

(MSA § 16.3.1(1)(C).) The State could also terminate the MSA for any reason, if it determined that such termination was in its best interest.

Once IBM began to roll out the modernized system to the twelve-county pilot area, the parties saw implementation issues immediately. These included call center issues, untimely processing of applications and redeterminations for benefits and a failure to follow proper procedures. Despite these challenges, the State approved rolling out the project to additional Indiana counties. In total, the modernized system was rolled out in fifty-nine (59) of the ninety-two (92) counties.

IBM cites, and the trial court found, two factors that contributed to the initial difficulties with the modernization project. First, after the rollout to the pilot region, Indiana was faced with the "Great Recession," and the State unemployment rate more than doubled. Because of this, benefit applications increased dramatically. Second, Indiana was hit with a series of natural disasters (flooding) beginning in 2008. These disasters also impacted rollout of the modernization

6

project. The parties mutually agreed to suspend rollout of the modernization project in order to accommodate disaster relief efforts.

The MSA contains provisions which address economic downturn and natural disasters. Schedule 11 of the MSA provides Material Assumptions applicable during the term of the MSA and includes the assumption that "there will be no . . . material economic downturn in the State of Indiana." (MSA Schedule 11.) It further provides that "an inaccuracy or error in any of the Material Assumptions shall not automatically entitle [IBM] to any Change which it may request" but that IBM could request changes be made "solely pursuant to the Change Order Process." (MSA § 4.1.3.) As for the natural disasters, the MSA defines a "Force Majeure Event" as: "fire, flood, earthquake, other act of God or nature . . . beyond the reasonable control of the affected party that delay or prevent the Party, directly or indirectly, from performing its obligations under the Agreement." (MSA Appendix I.) Also, the MSA provides that in the case of a Force Majeure Event, if "[IBM] is unable to perform any of its obligations under this Agreement or such performance is rendered impractical, [IBM] shall provide notice to the State. . . ." (MSA § 21.22.) IBM did not submit a Change Order regarding the recession nor did it provide notice to the State regarding a Force Majeure Event.

The State expanded the scope of IBM's work eleven (11) times during the course of the project, which led to additional strain on the modernized system. For instance, in 2007, the State added a Healthy Indiana Plan ("HIP") to provide insurance to uninsured Hoosiers below a certain income level. The volume of HIP applications far exceeded the State's initial projections, causing IBM to fall further behind in application processing.

During the rollout, the State conducted a series of project assessments. IBM received positive feedback from State officials. For instance, in May of 2008, FSSA Secretary Roob reported to the Indiana General Assembly that with regard to the modernization project, the State was "serving more people statewide and in a timelier manner than we ever have before." (Appellant's App. at 189.) In October of 2008, the director of FSSA's Division of Family Resources gave IBM primarily "9s and 10s out of 10" in IBM's annual customer satisfaction survey. (Id.) In December 2008, Governor Daniels said that the new system was "far better than

7

what preceded it." (Id.) However, despite the positive assessments, the project was not without significant problems.

In November of 2008, IBM met with FSSA Secretary Roob to propose changes to the project to address ongoing problems. The FSSA approved many of these proposed reforms. However, in March 2009, Secretary Roob's successor, Anne Murphy, sent a letter prepared by the State's outside counsel to IBM requesting a formal Corrective Action Plan ("CAP") pursuant to MSA § 15.4.1, which provides for a CAP as a remedy "to correct or resolve a breach" of the MSA. (Appellant's App. at 267.) The letter identified thirty-six (36) issues the State wanted IBM to address. Some of these issues included: excessive wait times at local offices and for appointments, incorrectly categorized imaged documents, high staff turnover, inaccurate and incomplete data gathering, scheduling problems, clients not receiving mailed correspondence, poor communication to all staff, unresolved help-ticket requests and untimely application and redetermination processing times for various welfare programs. IBM denied that a CAP was necessary and argued that many of the requested items did not relate to a contractual measure or performance standard in the MSA, but nevertheless agreed to work with the State to resolve the issues. In July of 2009, after IBM conducted its own assessment, the parties agreed on a CAP which included both long and short term goals.

Shortly after the CAP was entered into, the federal Centers for Medicare and Medicaid Services ("CMS") sent a letter to Indiana FSSA Secretary Murphy detailing its concerns with the Indiana welfare program. CMS noted that it had received numerous complaints from advocates, attorneys, legislative offices and consumers and that it was reported that consumers were experiencing: extended wait times for processing applications as well as for receiving responses to phone calls to the call center, lack of responses to applications, inappropriate disenrollments, numerous difficulties with navigating the new eligibility system and denial of benefits without appropriate notice of appeal rights. CMS noted that FSSA was not in compliance with federal regulations and requested the State provide its own CAP to ensure that federal requirements were being met.

8

As for IBM's progress on the CAP it entered into with the State, in September 2009, Secretary Murphy stated that "a team of vendors led by IBM Corp. has already made improvements in technology and added more staff under a corrective action plan submitted in July. . . [however] the timeliness of processing applications for food stamps, Medicaid and other benefits has not improved." (Appellant's App. at 193; Tr. Ex. 111.) That same month, the State decided to change approaches and adopt a hybrid approach to welfare modernization, referred to by the parties as "Plan B." Plan B moved away from the centralized call center and moved eligibility determinations back to the local office, increasing face-to-face contact between clients and staff. While the State initially sought IBM's services to implement Plan B, the parties did not reach an agreement regarding the price of the services. However, the State encouraged IBM to continue on as the technology vendor.

On October 15, 2009, Secretary Murphy sent a letter to IBM explaining that the State was terminating the MSA for cause, effective December 14, 2009. The letter provided that IBM's breaches included but were not limited to, "numerous and repeated quality and timeliness failures." (Appellant's App. at 839.) The letter further provided that IBM's breaches were material considering the MSA as a whole and that IBM cannot reasonably cure the breaches within thirty (30) days. It also provided that some, but not all, of IBM's breaches were subject to the CAP, that IBM had not proceeded diligently pursuant to the CAP and that there have been new breaches since IBM entered into the CAP. Finally, it provided that IBM's series of breaches, collectively, constituted a material breach of the MSA when considering the MSA as a whole.

Thereafter, on May 13, 2010, the State filed a complaint for damages and declaratory relief against IBM in the Marion Superior Court seeking over $170 million in damages. The same day, IBM filed a complaint against the State seeking damages in excess of $52 million.

The parties filed numerous motions for summary judgment in this matter, one of which relates to the materiality of the breach. That is, the State filed a motion for summary judgment relating to the impact of the recession and the natural disasters (flooding) on IBM's performance. The trial court granted summary judgment for the State, finding that "any contention by IBM at trial that the economic downturn or flooding rendered its performance 'impossible' or otherwise

9

excuses any failure by IBM to meet any of its contractual obligations under the MSA, is therefore precluded as a matter of law." (Appellant's App. at 391.) The court found that with regard to the recession, IBM either failed to seek a Change under the change order process or assumed the risk by agreeing to the Material Assumptions, and with regard to the flood, IBM failed to provide notice of a Force Majeure Event to the State.

This matter proceeded to a six-week bench trial. In its sixty-five (65) page findings of fact and conclusions of law, the trial court determined (among other things) that the State failed to prove that IBM materially breached the MSA and that IBM substantially performed the MSA. The Court of Appeals majority reversed the trial court on the material breach issue, finding that IBM materially breached the MSA. State ex rel. Indiana Family & Soc. Servs. Admin. v. Int'l Bus. Machines Corp., 4 N.E.3d 696, 702 (Ind. Ct. App. 2014), vacated in part. The Court of Appeals majority looked to the Policy Objectives to define the essence of the contract and found that it was "to provide and expand access to services for welfare recipients in a timely, reliable and efficient manner" while remaining within federal guidelines, reducing fraud and increasing work-participation rates. Id. at 718. It found that IBM failed to do so. Id. at 728.

The parties each filed cross-petitions to transfer on several issues including: whether IBM materially breached the MSA, whether IBM is entitled to deferred fees for costs incurred during the project and whether IBM is entitled to assignment fees for the State assuming IBM's subcontracts. We granted those petitions and now address only the material breach issue. We hold that IBM materially breached the MSA and reverse the trial court's finding that there was no material breach. With regard to all other issues, we summarily affirm the Court of Appeals.[2] Finally, we remand this case to the trial court for calculation of damages consistent with this opinion, including offsetting any amounts awarded to IBM by the finding that it materially breached the MSA.

---

[2] This includes all issues raised in the cross-petitions to transfer as well as several other issues not raised on transfer but included in the Court of Appeals opinion, including whether IBM is entitled to equipment costs for equipment retained by the State upon terminating the MSA, whether IBM is entitled to fees related to change orders and whether IBM is entitled to prejudgment interest. All of these issues are also summarily affirmed.

**Standard of Review**

The trial court entered findings of fact and conclusions of law. We may not set aside the findings or judgment unless they are clearly erroneous. Menard, Inc. v. Dage–MTI, Inc., 726 N.E.2d 1206, 1210 (Ind. 2000), reh'g denied (citation omitted). "In our review, we first consider whether the evidence supports the factual findings." Id. "Second, we consider whether the findings support the judgment." Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). "A judgment is clearly erroneous if it relies on an incorrect legal standard." Menard, 726 N.E.2d at 1210 (citation omitted). We give due regard to the trial court's ability to assess the credibility of witnesses. Id. While we defer substantially to findings of fact, we do not defer to conclusions of law. Id. "We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment." Yoon v. Yoon, 711 N.E.2d 1265, 1268 (Ind. 1999).

**Discussion**

**I.        Standard for Assessing Materiality of a Breach**

"Whether a breach is material is generally a question of fact to be decided by the trier of fact." Collins v. McKinney, 871 N.E.2d 363, 375 (Ind. Ct. App. 2007) (citing Goff v. Graham, 159 Ind. App. 324, 306 N.E.2d 758, 765 (1974)). A material breach is often described as one that goes to the "heart of the contract." See Collins, 871 N.E.2d at 370.

Here, the MSA provides the standard for what constitutes a material breach. Specifically, the MSA provides that a breach is material if it is "material considering this Agreement as a whole." (MSA § 16.3.1(1)(A).) It further provides that a series of breaches, none of which individually constitutes a breach of the Agreement, may nevertheless "collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole . . . ." (MSA § 16.3.1(1)(C).) The MSA also provides detailed performance standards and measurements to assess IBM's performance. For instance, the MSA provides that IBM's satisfactory performance will be measured by the following eight standards:

11

1) Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;
2) Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;
3) Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];
4) Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Article 9 (with all results of such Audits being addressed in accordance with the Governance Plan);
5) Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);
6) Timeliness, completeness, and accuracy of required reports;
7) Determination by the State of (i) [IBM]'s satisfactory performance of the Services and the Delegated Activities; and (ii) [IBM]'s satisfactory oversight and management of the Subcontractors; and
8) [IBM]'s efforts to assist the State in achieving the Policy Objectives.

(MSA § 3.8.2.)

The MSA also provides four categories of performance standards, which are applicable to various phases of the project, and are associated with specific monetary consequences (liquidated damages) in the event they are not met:

1) Service Levels: the performance metrics, and associated penalties and incentives, that focus on [IBM]'s processing accuracy in administering the Programs and which impose more stringent measurements of the error rates than those currently applied.
2) Key Performance Indicators ("KPI" or "KPIs"): performance metrics, and associated penalties, designed to provide incentive to [IBM] to focus on other key metrics related to the Service components that are important to the State and its Clients.
3) Critical Transition Milestones: penalties imposed if [IBM] does not achieve the Critical Transition Milestones

12

identified by the State that are critical to the successful transition of the Services.

4) Federal Penalties: penalties imposed by the Federal government, as set forth in Section 15.2.6 of the Master Services Agreement.

(MSA Schedule 10.)

Both the trial court and the Court of Appeals majority discuss the MSA's materiality provision as well as the performance standards and measures. However, both courts also relied upon the common law Restatement factors to assess the materiality of the breach. Under the common law, when determining whether a breach is material, Indiana courts generally apply the factors articulated in the Restatement (Second) of Contracts § 241 (1981):

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

See Collins, 871 N.E.2d at 375 (citing Frazier v. Mellowitz, 804 N.E.2d 796, 803 (Ind. Ct. App. 2004)).

However, the default common law Restatement factors do not apply in this case because the plain language of the MSA provides for evaluating the materiality of a breach by considering the breach or a series of breaches in light of the MSA "as a whole." (MSA § 16.3.1(1)(A), (C).) Applying the specific terms agreed to by the parties rather than the common law default rule is consistent with Indiana contract law principles. Indiana courts zealously defend the freedom to contract. Peoples Bank & Trust Co. v. Price, 714 N.E.2d 712, 717 (Ind. Ct. App. 1999). "The existence of express terms in a valid contract precludes the substitution of and the implication in

13

law of terms regarding the subject matter covered by the express terms of the contract." Zoeller v. E. Chicago Second Century, Inc., 904 N.E.2d 213, 221 (Ind. 2009) (citations omitted); See also, New Welton Homes v. Eckman, 830 N.E.2d 32, 35 (Ind. 2005). (Courts must not displace the contractually specified rights and remedies but "must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and . . . enforce them as agreed upon.")

While Indiana has not expressly addressed whether contract provisions supersede the common law in the context of assessing whether a breach is material, other jurisdictions provide some persuasive authority in this area. For instance, Vermont has recognized that "[c]ontracting parties can define what will constitute a material breach of their contract." McGee Const. Co. v. Neshobe Dev., Inc., 594 A.2d 415, 417 (Vt. 1991.) Also, Williston on Contracts provides: "[w]here the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision." 23 Williston on Contracts § 63:3 (4th ed.) (citing Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., 100 N.J. 166, 495 A.2d 66, 75 (1985)). Similarly, the Arizona Court of Appeals held that where there are contractual standards for evaluating the materiality of a breach, "[a]pplying the Restatement (Second) of Contracts § 241 . . . would require us to ignore the express terms that the parties contracted for and essentially rewrite the contract." Mining Inv. Grp., LLC v. Roberts, 177 P.3d 1207, 1211 (Ariz. Ct. App. 2008). Furthermore, it is not necessary to apply the common law Restatement factors where "the contract itself expressly provides for the materiality of the breach at issue." Roberts, 177 P.3d at 1211.

We agree. Thus, as a threshold matter, we hold that where a contract itself provides the standard for what constitutes a material breach, this is the standard that governs. The common law standard only applies in the absence of a contractual provision regarding what constitutes a material breach.

## II.    The Role of Policy Objectives

Applying common law contract principles, the Court of Appeals majority determined that the "heart of the contract" was found in the MSA Policy Objectives.  These Policy Objectives provide, in relevant part:

> (1) (i) to provide efficient, accurate and timely eligibility determinations for individuals and families who qualify for public assistance, (ii) to improve the availability, quality and reliability of the services being provided to Clients by expanding access to such services, decreasing inconvenience and improving response times, among other improvements, (iii) to assist and support Clients through programs that foster personal responsibility, independence and social and economic self-sufficiency, (iv) to assure compliance with all relevant Laws, (v) to assure the protection and integrity of Personal Information gathered in connection with eligibility determination, and (vi) to foster the development of policies and procedures that underscore the importance of accuracy in eligibility determinations, caseload integrity across all areas of public assistance and work and work-related experience for Clients in the Programs.

(Appellant's App. at 567.)  The MSA provides that when construing and interpreting provisions and terms of the MSA, "[i]n the event of any uncertainties" or in the event of any "ambiguity, vagueness, or inconsistency" the "provisions and terms shall be read in a manner consistent with the Policy Objectives."  (MSA § 1.4(5).)  However, the MSA also provides that:

> [n]otwithstanding the foregoing, in no event shall the Policy Objectives change or expand [IBM]'s obligations hereunder unless expressly agreed to by the Parties pursuant to a Change.

(MSA § 1.4(5).)

As discussed above, because the MSA itself provides various performance standards and measures for assessing whether a breach or a series of breaches is material in light of the contract as a whole, common law contract principles do not apply.   So the question becomes, what is the role of the Policy Objectives in assessing the materiality of a breach?

15

IBM argues that it cannot be held responsible for breaching the Policy Objectives pursuant to the plain language of the MSA, which provides that the Policy Objectives cannot "change or expand [IBM]'s obligations." (MSA § 1.4(5).) Thus, IBM argues that the Court of Appeals majority's determination that the essence of the contract is found in those Policy Objectives is flawed as it never addresses this disclaimer. IBM is correct that, in and of themselves, the Policy Objectives set forth in the MSA cannot, pursuant to the disclaimer in MSA § 1.4(5), impose changed or additional obligations on IBM and thus, we agree that the Court of Appeals majority may have placed undue emphasis on the Policy Objectives being the "core of the contract." Int'l Bus. Machines Corp., 4 N.E.3d at 717, vacated in part.

However, to the extent the Policy Objectives are contained in other parts of the MSA, they are relevant to our materiality analysis. For instance, one of the Performance Standards is IBM's efforts to assist the State in achieving the Policy Objectives. When the State failed to provide efficient, accurate and timely eligibility determinations for Clients, improve response times and comply with all relevant laws, IBM was responsible for failing to assist the State because IBM's actions or lack of action caused or contributed to these problems.

Further, the MSA also provides that when construing and interpreting provisions and terms of the MSA, "[i]n the event of any uncertainties" or in the event of any "ambiguity, vagueness, or inconsistency," the "provisions and terms shall be read in a manner consistent with the Policy Objectives." (MSA § 1.4(5).) Thus, IBM could not completely turn a blind eye to these objectives. IBM's efforts to assist the State in meeting the Policy Objectives are one factor in assessing IBM's performance.

III.    **Whether IBM's performance constituted a material breach pursuant to the MSA.**

While we disagree with the standard used by the Court of Appeals majority to determine whether IBM materially breached the MSA, we agree with the Court of Appeals majority that IBM did materially breach the MSA. The trial court's determination that IBM did not materially breach the agreement is incorrect as it ignored uncontroverted evidence and made several legal errors. These errors include: a) failing to consider the State's dissatisfaction with IBM's performance as

16

required by the MSA; b) determining that IBM's payment of liquidated damages excused IBM's performance in contravention of the MSA; c) adopting IBM's excuses for non-performance; d) considering the State's motives for terminating the contract; and e) determining that because the State benefited from the MSA, IBM's breach could not be material. We will address each error in turn.

**A.      The State's dissatisfaction with IBM's performance should have been considered by the trial court.**

According to MSA § 3.8.2, satisfactory performance of the Agreement by IBM "will be measured by" eight standards, including "[d]etermination by the State of (i) [IBM]'s satisfactory performance of the Services and the Delegated Activities." (MSA § 3.8.2.) With regard to satisfaction, a "reasonable person standard is employed when the contract involves commercial quality, operative fitness, or mechanical utility which other knowledgeable persons can judge." Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck, 422 N.E.2d 670, 675 (Ind. Ct. App. 1981) (citations omitted). Performance is satisfactory if a reasonable person in exactly the same circumstances would be satisfied. Estate of Glueck, 422 N.E.2d at 675. When this standard is used, "dissatisfaction [cannot] be claimed arbitrarily, capriciously or unreasonably." Id. Furthermore, "the mere statement by the recipient that he is dissatisfied is not conclusive." Id.

The trial court found that the State set forth record evidence, including "confirming documents and testimony by IBM witnesses, that the State was 'dissatisfied' with aspects of the Modernization Project (as was IBM)." (Appellant's App. at 214.) For instance, several key IBM executives made admissions such as: "[t]he project didn't perform at a level that I would have found to be satisfactory;" the State was not "satisfied in 2009;" and the State had a "reasonable basis to be dissatisfied." (Appellant's Brief at 10.) IBM's trial representative also admitted that he heard no evidence at trial that IBM's performance was good in 2009.

Although the evidence showed that the State was not satisfied with IBM's performance, the trial court concluded that this dissatisfaction did not support a claim of breach (let alone a material breach). Instead, the trial court found that the State's dissatisfaction was just one of eight enumerated ways in which IBM's performance was measured and that in light of the benefits the State received, this dissatisfaction is not material. This was error. As discussed above, the MSA

17

provides that a breach is material if it is "material considering this Agreement as a whole." (MSA § 16.3.1(1)(A).) It further provides that a series of breaches, none of which individually constitutes a breach of the Agreement may nevertheless "collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole . . . ." (MSA § 16.3.1(1)(C).) The performance metrics set forth in the MSA, including the one regarding the State's satisfaction, are therefore key in determining whether there was a breach or a series of breaches that are material considering the MSA as a whole. Thus, while the trial court may be correct that dissatisfaction alone may not be enough, it could collectively constitute a material breach along with other breaches of the MSA.

While IBM contends that the State merely argues in conclusory terms that the uncontroverted evidence establishes the State's dissatisfaction, this is not the case as IBM representatives themselves confirmed the State's dissatisfaction. As mentioned above, several key IBM executives made admissions such as: "[t]he project didn't perform at a level that I would have found to be satisfactory;" the State was not "satisfied in 2009;" and the State had "reasonable basis to be dissatisfied." (Appellant's Brief at 10.) IBM's trial representative also admitted he heard no evidence at trial that IBM's performance was good in 2009.

IBM also argues that its performance was praised throughout the project and that the State's actions in expanding the scope of its work further demonstrate the State's satisfaction. It is true that State officials made positive public comments about the project. However, the content of the positive remarks, e.g., the State was "serving more people statewide and in a timelier manner than we ever have before," was more about the project overall in comparison to the prior system, and not necessarily akin to a statement that IBM was performing well. As for expansion of IBM's services, this also is not especially indicative of the State's satisfaction with IBM's performance because IBM was the State's selected vendor for the provision of welfare services at the time. Thus, it is not surprising that the State gave additional welfare-related work to IBM. Finally, the contract was terminated in 2009. Positive comments and expansion of work in years prior to termination are not good indicators of the State's satisfaction in 2009. The record evidence is that in 2009 the State was not satisfied with IBM's performance and IBM agreed that the State should not have been. Accordingly, the State's dissatisfaction with IBM's performance should have been

18

considered by the trial court when determining whether IBM materially breached the MSA as satisfaction is listed as a performance measure, and the evidence shows that the State's dissatisfaction with IBM's performance was reasonable in light of IBM's own admissions.

**B.      Payment of liquidated damages does not excuse a material breach pursuant to the plain language of the MSA.**

In the event of certain breaches by IBM for failing to perform according to the performance standards set forth in MSA Schedule 10, MSA § 15.2.5(3) provides for liquidated damages which were "not intended to be in the nature of a penalty," but were "intended to be reasonable estimates of the State's projected financial loss and damage resulting from [IBM]'s breach." Although these liquidated damages were the "sole and exclusive remedy" for certain damages as a result of IBM's performance failures, the MSA clearly provides that the liquidated damages provision "shall not limit (i) any applicable State termination rights in Article 16" (Termination). MSA § 15.2.5(4).

The trial court found as a matter of fact that certain timeliness metrics set forth in Schedule 10 "were consistently missing the mark." (Appellant's App. at 210.) However, despite this fact, and the express reservations of the State's termination rights, the trial court found that IBM's failure to meet timeliness metrics did not constitute a material breach because "[l]iquidated damages were paid in lieu of performance and provided IBM with an alternative means of performance that was satisfied by payment (which payment is undisputed)." (Appellant's App. at 212.) This was error. The plain language of the MSA provides for no such alternative performance. On the contrary, it provides that the State may pursue its termination rights, including its right to for-cause termination for a material breach or a series of breaches that collectively constitute a material breach. (MSA § 16.3.1(1)(A), (C).) Accordingly, payment of the liquidated damages does not excuse IBM's breach and thus, the trial court should have considered IBM's consistent failure to meet certain timeliness metrics in determining whether IBM materially breached the MSA.

**C.      The economic downturn, natural disasters and surge in HIP applications do not impact the material breach analysis.**

The trial court cited three factors that negatively impacted IBM's performance: 1) the economic downturn or recession; 2) the natural disasters or flooding in Indiana; and 3) the unexpected surge in HIP applications. However, none of these factors should have impacted the court's material breach analysis.

First, is the economic downturn in Indiana. One of the Material Assumptions in the MSA provides that there would be no "material economic downturn in the State of Indiana." (MSA Schedule 11.) The MSA further provides that while "an inaccuracy or error in any of the Material Assumptions shall not automatically entitle [IBM] to any Change which it may request," IBM could request changes to be made "solely pursuant to the Change Order Process." (MSA § 4.1.3.) IBM made no request for a Change. Thus, IBM cannot use the economic downturn in Indiana as an excuse for its nonperformance.

Next, is the natural disasters or flooding in Indiana. The MSA defines a "Force Majeure Event" as: "fire, flood, earthquake, or other act of God or nature . . . beyond the reasonable control of the affected party that delay or prevent the Party, directly or indirectly, from performing its obligations under the Agreement." (MSA Appendix I.) Also, the MSA provides that in the case of a Force Majeure Event, if "[IBM] is unable to perform any of its obligations under this Agreement or such performance is rendered impractical, [IBM] shall provide notice to the State. . . ." (MSA § 21.22.) IBM did not provide notice to the State regarding a Force Majeure Event. Thus, IBM cannot use the flooding in Indiana as an excuse for its nonperformance.

Both the recession and the flooding were the subject of one of the State's pre-trial motions for summary judgment. The trial court granted summary judgment for the State on this issue, finding that "any contention by IBM at trial that the economic downturn or flooding rendered its performance 'impossible' or otherwise excuses any failure by IBM to meet any of its contractual obligations under the MSA, is therefore precluded as a matter of law." (Appellant's App. at 390-391.) With regard to the recession, the trial court found that IBM either failed to seek changes

20

under the change order process or assumed the risk by agreeing to the Material Assumptions and with regard to the flood, IBM failed to provide notice of a Force Majeure Event to the State.

Despite its own pre-trial ruling, the trial court cited both the recession and the flooding in its findings of fact and conclusions of law. IBM argues that the trial court considered these events, not to excuse IBM's performance, but to conduct the appropriate analysis under the Restatement. However, as we hold that the Restatement analysis does not apply when there is a contractual provision that sets forth the standard for determining whether a breach is material, we are not required to conduct an analysis pursuant to the Restatement. Instead, we look to the language of the MSA itself. The MSA provides for the Change Order process in the event a Material Assumption is later found to be inaccurate. It further provides for giving notice to the State in the case of a Force Majeure Event. IBM failed to avail itself of either of these relief mechanisms. In its summary judgment order, the trial court itself held that IBM could not argue these events excused its non-performance. We agree. The trial court should have abided by its own order and not considered the impact of the recession or flooding on IBM's performance when conducting its material breach analysis.

The trial court also improperly considered the surge in applications from the HIP program. The Court found that "HIP application volume regularly exceeded the State's predictions . . . and the State described this as a significant challenge for the modernized system." (Appellant's App. at 184-85) (footnote omitted). However, the MSA set forth a procedure for IBM to seek service and fee changes:

> Upon the occurrence of . . . any sudden and material increase in the number of Clients utilizing the Services beyond that which might reasonably be anticipated, [IBM] shall be entitled to provide the Services at a location other than a Service Location on a temporary basis. . . [IBM] may make this determination in its discretion, and any additional charges associated therewith shall be determined in an equitable manner in accordance with the Change Order Process.

(MSA § 3.4.3(3).) Also, MSA § 3.12.3(1) provides that a change "relating to an expansion of or change to the Services" required a Change Order. IBM obtained many Change Orders, including

21

Change Order 23, to account for the HIP application increase. IBM was compensated for the Change due to the increased HIP applications. We agree with the State and the Court of Appeals majority that IBM should not receive a double remedy: first more fees for increased scope of work and then an excuse for its performance issues. The trial court should not have considered the HIP application increase when determining whether IBM materially breached the MSA.

### D. The State's motive for terminating the MSA is irrelevant.

IBM argues that the State did not terminate the MSA for performance issues as it has maintained throughout this litigation. It argues that the State's chief complaints about the project are not with IBM's performance but with the reduction of face-to-face interactions, a key feature of the plan set forth in the MSA and one which the State developed. IBM also cites Governor Daniels' comments on the day the termination of the MSA was announced to the public. IBM argues that Governor Daniels "commended IBM for its work, citing a number of benefits the IBM Coalition had conferred on the State," demonstrating that the State terminated the MSA for reasons other than IBM's material breach. (Appellee's Brief at 9.)

Even assuming, *arguendo*, that IBM is correct, and the State had other reasons for terminating the MSA, it cites no case law in support of the proposition that a party's motive for terminating a contract matters. A party's motives or reasons for making contract decisions are generally regarded as irrelevant. Epperly v. Johnson, 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000) (citing Vernon Fire & Cas. Ins. Co. v. Sharp, 264 Ind. 599, 607, 349 N.E.2d 173, 180 (1976)). While IBM is correct that neither Epperly nor Sharp go so far as to say a party's actual motivation for terminating a contract is *always* irrelevant, as the trial court observed, "evidence of prior or contemporaneous written or oral statements and negotiations cannot operate to either add to or contradict the written contract." Hinkel v. Sataria Distrib. & Packaging, Inc., 920 N.E.2d 766, 769 (Ind. Ct. App. 2010). Thus, it does not matter what State officials were saying about the State's motivation for terminating the contract; only the written terms of the contract matter. Accordingly, the trial court should not have considered whether the State had other motives or reasons for terminating the MSA.

22

Finally, this Court notes IBM's argument that it is the State's flawed plan, including the move away from the face-to-face meetings that is real problem, not IBM's performance. However, as the Court of Appeals majority aptly noted: "If IBM did not think that it could carry out this concept, then it presumably would not have executed the MSA." Int'l Bus. Machines Corp., 4 N.E.3d at 726, vacated in part.

**E.      The benefits received by the State do not ameliorate a material breach.**

The trial court focused on the benefits provided to the State in determining that IBM substantially performed and thus, did not materially breach the MSA. However, balancing the benefits received by the State with IBM's performance failings is not the appropriate standard for determining whether there is a material breach. Again, the MSA provides that a breach is material if it is "material considering this Agreement as a whole." (MSA § 16.3.1(1)(A).) It further provides that a series of breaches, none of which individually constitutes a breach of the Agreement may nevertheless "collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole . . . ." (MSA § 16.3.1(1)(C).)

This standard does not involve consideration of the benefits received by the State, nor the benefits received by IBM. Both parties received substantial benefits from the MSA. As the trial court found, the benefits to the State included: 1) an electronic welfare-eligibility system that "enhance[d] access to program benefits;" 2) assistance in processing "millions of public benefit applications," which allowed the State to "serv[e] more people statewide and in a timelier manner" than ever before; 3) a "dramatic[ally]" improved welfare-to-work participation rate; 4) an end to "rampant" fraud that previously plagued Indiana's welfare system; 5) significant administrative cost savings; 6) an electronic paperless eligibility system; and 7) technology and infrastructure that the State can use going forward with the Hybrid system (aka "Plan B"). (Appellant's App. 203-207.) IBM received the benefit of the fees paid by the State in an amount over $437 million. Notwithstanding the benefits conferred upon and received by both parties, we must look to IBM's performance in light of the contract as a whole when determining whether it materially breached the MSA.

Here, while there is no standout, singular breach on the part of IBM that constitutes a material breach, the record reflects that there were numerous and repeated failures on the part of IBM in its provision of welfare services to Hoosiers that, in view of IBM's history of breaches, collectively constitute a breach of the MSA. The MSA sets forth various standards and measurements in order to assess IBM's performance that are helpful in our analysis. It provides that IBM's satisfactory performance will be measured by the following eight standards:

1) Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;
2) Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;
3) Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];
4) Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Article 9 (with all results of such Audits being addressed in accordance with the Governance Plan);
5) Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);
6) Timeliness, completeness, and accuracy of required reports;
7) Determination by the State of (i) [IBM]'s satisfactory performance of the Services and the Delegated Activities; and (ii) [IBM]'s satisfactory oversight and management of the Subcontractors; and
8) [IBM]'s efforts to assist the State in achieving the Policy Objectives.

(MSA § 3.8.2.)

Additionally, as discussed above, certain performance metrics were associated with liquidated damage provisions in the event they are not met. For instance, the Schedule 10 Key Performance Indicators ("KPI" or "KPIs"), which related to timeliness. (MSA Schedule 10.)

IBM's performance was lacking in several of these areas. First, as discussed in Section A above, the State was not satisfied with IBM's performance. This dissatisfaction was confirmed by IBM's own witnesses. Additional failures are reflected in the March 2009 letter FSSA Secretary Murphy sent to IBM, which listed thirty-six (36) issues that the State wanted IBM to address,

24

including: excessive wait times at local offices and for appointments, incorrectly categorized imaged documents, high staff turnover, inaccurate and incomplete data gathering, scheduling problems, clients not receiving mailed correspondence, poor communication to all staff, unresolved help-ticket requests and untimely application and redetermination processing times for various welfare programs. Similar deficiencies were noted in CMS' letter to the State wherein CMS demanded the State come up with its own CAP. Problems CMS noted included: extended wait times for processing applications as well as for receiving responses to phone calls to the call center, lack of responses to applications, inappropriate disenrollments, numerous difficulties with navigating the new eligibility system and denial of benefits without appropriate notice of appeal rights. Indeed, even the trial court conceded that the record reflects that IBM struggled to timely provide services to Clients, finding that timeliness metrics were "consistently missing the mark." (Appellant's App. at 210.) Additionally, despite entering into a CAP with the State and despite making some improvements, FSSA Secretary Murphy noted a month prior to the State's letter of termination that ". . . the timeliness of processing applications for food stamps, Medicaid and other benefits has not improved." (Tr. Ex. 111.) Accordingly, the trial court erred in finding the benefits received by the State precluded a finding that IBM materially breached the MSA.

**Conclusion**

We hold that when a contract provides the standard for assessing the materiality of a breach, that standard governs. Only in the absence of such a provision does the common law, including the Restatements, apply. In this case, the MSA provides the standard to assess whether IBM materially breached the MSA.

The trial court erred in determining IBM did not materially breach the MSA. In determining whether IBM materially breached the MSA, the trial court should have considered the State's dissatisfaction with IBM's performance and IBM's failure to meet certain Schedule 10 metrics, despite IBM's payment of liquidated damages. The trial court should not have considered the economic downturn, natural disasters and the surge in HIP applications to justify IBM's performance failings in light of the MSA, which provided IBM with mechanisms to address these issues. The trial court also should not have considered the State's motive in terminating the MSA. The trial court also erred in determining that the benefits received by the State precluded a finding

25

of material breach where both parties benefited from the MSA and it is IBM's performance, not these benefits, that the trial court should have assessed. Finally, while the Policy Objectives themselves did not place a contractual requirement on IBM, to the extent these objectives were incorporated into other parts of the MSA, i.e., the performance standards, and also the construction and interpretation provision, they are a factor to be considered when assessing whether IBM's collective breaches were material.

Because IBM failed to perform satisfactorily as determined by the State (and by its own admission), consistently failed to meet certain timeliness metrics, and failed to assist the State in achieving its Policy Objectives, we hold that IBM did materially breach the MSA through its collective breaches in light of the MSA as whole. We therefore reverse the trial court's finding that IBM did not materially breach the MSA. We summarily affirm the Court of Appeals on all other issues including: affirming the trial court's award of $40 million in assignment fees and $9,510,795 in equipment fees to IBM, affirming the trial court's denial of deferred fees to IBM, and reversing the trial court's award of $2,570,621 in early termination close out payments and $10,632,333 in prejudgment interest to IBM. We also remand the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133, and for calculation of the parties' damages consistent with this opinion, including any appropriate offsets to the State as a result of IBM's material breach of the MSA.

Rush, C.J., Dickson and Rucker, J.J., concur.
Massa, J., not participating.

26