# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 18 2017, 8:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office LLC
Brooklyn Indiana

Christopher L. Arrington
Christopher L. Arrington Attorney at
Law, P.C.
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

I N   T H E
# COURT OF APPEALS OF INDIANA

In the Matter of:

L.B., C.L., B.L., G.L., M.L., and T.L.
Children in Need of Services,

C.B. and T.B.

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

January 18, 2017

Court of Appeals Case No.
32A01-1606-JC-1367

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause Nos.
32D03-1509-JC-88
32D03-1509-JC-89
32D03-1509-JC-90
32D03-1509-JC-91
32D03-1509-JC-92
32D03-1509-JC-93

**Bailey, Judge.**

# Case Summary

C.B. ("Mother") and T.B. ("Father") are married, each with children from a prior marriage. Their six minor children (the "Children") include Father's son, L.B., who was fifteen at the time of the instant proceedings, and Mother's five children ("Mother's Children"), seventeen-year-old G.L., fifteen-year-old C.L., thirteen-year-old T.L., eleven-year-old B.L., and eight-year-old M.L. Father and Mother jointly appeal the juvenile court's adjudication of the Children as children in need of services ("CHINS"), raising the sole restated issue of whether the evidence is sufficient to support the CHINS adjudication.

We affirm.

# Facts and Procedural History

In the spring of 2015, Mother and Father established a residence in Pittsboro. Mother's Children lived at the residence, and L.B. visited the residence on Wednesday evenings and also spent every other weekend there.

From August 2015 to September 2015, the Department of Child Services ("DCS") received six separate reports relating to three incidents involving the Children. Police also responded to the residence four times over a similar period. The first time police responded to the residence was in early July when the Children were not home. Father had called 9-1-1 because Mother had

placed a loaded gun in her mouth. Mother entered inpatient care for seventy-two hours and then began outpatient therapy.

[5] The first reported incident involving a child occurred in early August, during the period when Mother was still attending outpatient therapy. Father started an argument with Mother while C.L., G.L., and T.L. were in the kitchen, and Father began yelling at Mother. Father was drinking alcohol that night, and at that time Father regularly drank alcohol to excess. Father told C.L. and G.L. to go to their rooms, but C.L. refused to leave because he was concerned about Mother's and G.L.'s safety. Father continued to tell C.L. to go to his room, but C.L. would not leave the kitchen. Father pushed C.L. into a wall and C.L. fell near the stairs leading downstairs. Mother told Father not to push C.L. like that, and then G.L. told Father that he could not touch them like that. Father responded that he could touch them. Father then pushed G.L., whose head hit the wall. Father next "herded" C.L. approximately five feet down the hall by chest bumping him.

[6] Mother told G.L. to call the police, and G.L. complied. Deputy Anthony Goodpaster ("Deputy Goodpaster") responded to the call, and observed that Father smelled of alcohol and had glassy, bloodshot eyes. Deputy Goodpaster spoke with C.L., who was anxious, and could not stand in one spot. When Deputy Goodpaster spoke with Mother, she said there was an argument but felt it was not necessary for the police to be there.

[7] Following the incident, Family Case Manager Sarah Ash ("FCM Ash") of the Hendricks County Office of the DCS conducted an assessment. Father initially denied touching C.L. but eventually admitted he shoved and pushed C.L. down the hall. Father told FCM Ash that this was a "child problem not a parent problem." (Tr. at 348.) FCM Ash also spoke with Mother, who said she believed Father had a drinking problem, anger issues, and was hypersensitive when it came to the children. Mother said that the situation between Father and the children was stressful and they argued, and she was happy FCM Ash was there because she thought FCM Ash could force Father to participate in services. FCM Ash observed that Mother seemed nervous when speaking, was looking over her shoulder, and wanted to be separate from Father when talking to FCM Ash. At the end of the visit, FCM Ash provided information about counseling services and scheduled an appointment to create a safety plan.

[8] Before FCM Ash returned to develop a safety plan, DCS received reports about another incident. This incident involved L.B., who at some point prior to 2015 was diagnosed with ADHD, and could at times enter what Father termed an "ADHD meltdown." (Tr. at 780.) L.B.'s mother, D.B., lives in Noblesville, which is approximately forty-five minutes from Pittsboro. In late August, Father drove to Noblesville to pick up L.B. for midweek parenting time. During the drive to Pittsboro, Father discussed parenting time with L.B., telling L.B. that he was to cooperate when Father came to pick him up. During the discussion in the car, L.B. was obviously upset, "emotionally in chaos," (Tr. at 779), and felt caught in the middle of his parent's high-conflict divorce. Once

Father and L.B. arrived in Pittsboro, Father continued discussing parenting time with L.B., who became increasingly emotional. Father believed that L.B. entered an "ADHD meltdown," and at some point during the "meltdown," Father placed his hand on L.B.'s chest. No one else was home at the time.

[9] Later that day, after D.B. picked up L.B., she called the Hendricks County Sheriff's Department, and Deputy Goodpaster again responded to the call. After speaking with L.B. and D.B., Deputy Goodpaster went to Father's and Mother's home, and Father denied any physical altercation. Deputy Goodpaster smelled alcohol and believed that Father was intoxicated because of Father's bloodshot eyes, slurred speech, and unsteadiness.

[10] The third incident occurred in mid-September, when Father, Mother, and the Children were at the Pittsboro residence. Father looked out the window and observed L.B. and C.L. playing outside. Father claimed he saw L.B. holding a ditch ax, swinging it at C.L. and also using the ax to strike a fence post. Father yelled for the boys to come in. When the boys came inside, Father told C.L. to go do something else, and he did. Father then told L.B. he was going to punish him for damaging the fence post and because L.B. did not come inside as quickly as Father thought he should. Father told L.B. he was going to spank him with his belt. When L.B. questioned why Father was going to spank him, Father interpreted the questions as challenging Father's authority. Father and L.B. took their argument to the enclosed porch on the back side of the home. Father recorded part of the encounter on his cellphone. During the encounter, Father repeatedly told L.B. to turn around. At one point, Father said he would

take L.B. down, and L.B. urged him do it. The two then tumbled to the porch floor, and Father said, "Big man, huh?" L.B.'s voice became weaker and raspy as he kept asking Father to please get off of him.

[11] While Father and L.B. were arguing, C.L. went around the house to the enclosed porch, and M.L. was with him. M.L. opened the door and gasped. C.L. saw L.B. on his back with Father straddling him. Father had his forearm pressing down on what C.L. thought was L.B.'s throat, and Father had a belt in his hand. The recording captured Father telling someone to give him "the phone" and he then shut the door. Father told C.L. that he would be next.

[12] Father admitted that he was on top of L.B. until L.B. "went limp." (Tr. at 873.) Father got off of L.B. and spanked L.B. on his buttocks. Father reprimanded L.B., and in a raised and angry voice repeatedly asked L.B. what he was thinking. Father and L.B. went inside the home, and L.B. got increasingly upset and entered an "ADHD meltdown" in front of Mother and the rest of the family. Father then took L.B. upstairs to the master bedroom. During the encounter upstairs, Father again spanked L.B. with his belt. Father also tried showing L.B. the recording of their encounter downstairs, and when Father did, L.B. became more and more emotional to the point of crying. C.L., G.L., M.L. and Mother heard Father and L.B. yelling, and went upstairs to investigate. When Mother opened the door, C.L. saw L.B. backed up against the wall with Father in his face. L.B.'s face was red, he was crying, and he looked both scared and angry. L.B. asked Mother to call the police. Mother went into the bathroom and either C.L. or G.L. called the police.

[13] Multiple officers responded to the police call, and Hendricks County Sheriff's Deputy Nathan Hibschman ("Deputy Hibschman") was the investigating officer. L.B. told Deputy Hibschman that he was strangled and that Father had been on top of him, pressing down with all of his weight. When L.B. spoke, he was visibly upset, on the verge of tears, and shaking. Deputy Hibschman did not observe red marks on L.B.'s neck or see obvious signs of injury, but did not examine L.B.'s chest or buttocks. When Deputy Hibschman spoke with Father, Father was calm. Father told Deputy Hibschman that L.B. was defiant and that Father was attempting to discipline L.B. Another responding officer spoke with C.L., who observed that C.L. was upset and anxious. C.L. was nervous with fast speech. The officer also observed L.B., who was crying and upset but who calmed down when he left with D.B.

[14] Beyond conducting basic investigations, the police took no further action after responding to the three incidents involving Father. On September 30, 2015, DCS filed CHINS petitions as to all of the Children. Following a fact-finding hearing spanning several days, the juvenile court entered a single order adjudicating all of the Children as CHINS on March 22, 2016. The juvenile court entered a dispositional order on May 26, 2016.

[15] This appeal ensued.

# Discussion and Decision

Mother and Father challenge the sufficiency of the evidence supporting the CHINS adjudications. For a child to be adjudicated a CHINS, "'the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code.'" *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)). In reviewing a CHINS adjudication, we neither reweigh the evidence nor judge the credibility of witnesses. *Id.* We consider only the evidence that supports the juvenile court's decision and all reasonable inferences to be drawn therefrom. *Id.*

Here, the juvenile court entered findings and conclusions *sua sponte*, pursuant to Indiana Trial Rule 52(A). In reviewing findings and conclusions, we give due regard to the trial court's ability to assess the credibility of witnesses. Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Id.* "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). We review any remaining issue under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 158 (Ind. 2016).

In this case, DCS alleged that the Children were CHINS under Indiana Code section 31-34-1-1,[1] which reads as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> >
> > (2) the child needs care, treatment, or rehabilitation that:
> >
> > > (A) the child is not receiving; and
> > >
> > > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Mother and Father first argue that DCS failed to prove that their actions or inactions seriously endangered the Children's physical or mental condition. Mother and Father focus their argument on whether Father was justified in imposing discipline of the type he used during the incidents, observing that Indiana Code section 31-34-1-15 expressly provides that the CHINS statutes do not limit a parent's right to use "reasonable corporal punishment when

---

[1] DCS also petitioned under Indiana Code section 31-34-1-2. However, because each CHINS adjudication, at minimum, rested upon Indiana Code section 31-34-1-1, we need only discuss this section.

disciplining the child." Mother and Father also point out that the juvenile court, in its findings and conclusions, used language such as "battering" (App. Vol. 2 at 193) and "violence" (App. Vol. 2 at 192) that appeared to improperly cast disapproval on their protected choice of parenting style. The juvenile court, however, did not ultimately adjudicate the Children CHINS because of any of Father's physical interactions with them. Rather, as Mother and Father acknowledge, the adjudication was based on Father's mental abuse of the Children.

[20] Mother and Father also briefly assert that any so-called mental abuse related only to Father's authoritarian parenting style, which should be protected. Here, there was testimony that an authoritarian approach with a child with ADHD can make things more difficult and frustrating for the child. Moreover, in the months preceding the incidents, L.B. appeared to be on edge and overly stressed whenever parenting time with Father neared. Following the incidents, L.B. was diagnosed with anxiety, and a primary source of his anxiety was the possibility of returning to live with Father. One witness characterized L.B.'s relationship with Father as a "vicious cycle" (Tr. at 733), and the juvenile court determined that Father "deliberately pushes [L.B.] into 'ADHD meltdowns.'" (App. Vol. 2 at 195.) The juvenile court found the first incident involving L.B. illustrative, where Father began a lengthy discussion about parenting time and then continued the discussion after Father saw L.B. become increasingly emotional and approach a "meltdown." Ultimately, irrespective of potentially

protected parenting choices, there was sufficient evidence from which the juvenile court could conclude that father mentally abused L.B.

[21] As to Mother's Children, at one point before the reported incidents, Father locked Mother and some of Mother's Children out of the house at night, and refused to allow them to come back inside. That night, those children slept at their biological father's house. B.L., their biological father, told FCM Ash that he felt there was mental abuse going on in Mother's and Father's household. B.L. had witnessed Mother passed out drunk at the table while Father was "blowing a gasket" at Mother's Children. (Tr. at 403.) G.L. and C.L. said they were afraid of Father, did not feel safe in the home, and lacked support from Mother. G.L. kept food in her room because she and her siblings were hungry but did not want to go downstairs because they did not want to get yelled at. Moreover, the guardian ad litem appointed to Mother's Children had concerns for their emotional well-being. Thus, the evidence supports a determination that the Children were mentally abused.

[22] Mother and Father also challenge the sufficiency of evidence that the Children needed care, treatment, or rehabilitation they were not receiving. Their argument, however, focuses only on whether the Children's need for counseling arose from Father's protected parenting choices. Having already concluded that there was sufficient evidence of mental abuse, Mother and Father have not directed us to reversible error with respect to this statutory requirement.

[23]     Last, Mother and Father challenge whether DCS presented sufficient evidence that the Children were not likely to receive needed care, treatment, or rehabilitation without the coercive intervention of the court. Our supreme court has observed that this "element guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the *ability* to provide for their children, not merely where they encounter *difficulty* in meeting a child's needs." *In re S.D.*, 2 N.E.3d at 1287 (internal quotations omitted). Moreover, it is well-established that "a CHINS adjudication may not be based solely on conditions that no longer exist," rather, the juvenile court "should also consider the parents' situation at the time the case is heard." *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013) (internal citation omitted).

[24]     Here, L.B.'s therapist testified that, at this point in L.B.'s therapy, L.B. needed to cease contact with Father so that L.B. could successfully undergo the individual therapy he needed. Yet, in light of Father's and D.B.'s high-conflict divorce, the juvenile court observed that D.B. would be unable to prevent Father from contacting L.B. without the court's intervention. With respect to Mother's Children, FCM Ash suggested that the court order family therapy, and the evidence supported the inference that Mother's Children were in need of family therapy—therapy that would require Father's participation. Although Father testified that he was undergoing some degree of therapy, the juvenile court had reason to doubt whether Father would willingly participate in the sort of therapy Mother's Children needed. For example, in the context of Father's

dissolution proceeding, Father had assured the guardian ad litem that he would get counseling, but he did not. Father had also previously refused to participate in a child and family team meeting that FCM Ash requested. Accordingly, there is sufficient evidence from which the juvenile court could conclude that the court's coercive intervention was necessary.

# Conclusion

There was sufficient evidence to support the CHINS adjudication.

Affirmed.

Najam, J., and May, J., concur.